**ORAL ARGUMENT NOT YET SCHEDULED**

No. 25-5041

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

VANDA PHARMACEUTICALS INC.,

*Plaintiff-Appellant,*

v.

UNITED STATES FOOD AND DRUG ADMINISTRATION ET AL.,

*Defendants-Appellees,*

and

TEVA PHARMACEUTICALS, USA, INC.,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Columbia
Case No. 23-cv-280, Honorable Tanya S. Chutkan

**FINAL BRIEF FOR APPELLEE-INTERVENOR**
**TEVA PHARMACEUTICALS, USA, INC.**

Brian T. Burgess
Isabel M. Marin
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
*bburgess@goodwinlaw.com*
*imarin@goodwinlaw.com*

*Attorneys for Intervenor-Defendant-Appellee*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and *Amici*

All parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Plaintiff-Appellant Vanda Pharmaceuticals Inc.

### B. Rulings Under Review

Reference to the ruling at issue appears in the Brief for Plaintiff-Appellant Vanda Pharmaceuticals Inc.

### C. Related Cases

This case has not previously been before this court. Counsel is aware of no related cases in this Court or in any other court.

Dated: November 18, 2025

Respectfully submitted,

/s/ *Brian T. Burgess*
Brian T. Burgess

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Teva Pharmaceuticals USA, Inc. states that it is an indirect wholly owned subsidiary of Teva Pharmaceutical Industries Ltd., which is a publicly traded company. The aforementioned company owns at least 10% of the stock of Teva Pharmaceuticals USA, Inc.

Dated: November 18, 2025

Respectfully submitted,

/s/ *Brian T. Burgess*
Brian T. Burgess
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
*bburgess@goodwinlaw.com*

## TABLE OF CONTENTS


**Page**

GLOSSARY OF TERMS .......... x

INTRODUCTION .......... 1

STATEMENT OF THE ISSUES .......... 4

STATEMENT OF THE CASE .......... 4

I. Statutory and Regulatory Background .......... 4

II. Factual Background and Procedural History .......... 8

A. Vanda secures FDA approval for Hetlioz® with labeling that includes limited use of braille. .......... 8

B. FDA approves Teva's generic tasimelteon product .......... 10

C. Vanda seeks to thwart generic competition by filing numerous lawsuits, injunction requests, and citizen petitions. .......... 12

D. FDA denies Vanda's citizen petition. .......... 14

E. The district court grants summary judgment to FDA and Teva. .......... 17

SUMMARY OF ARGUMENT .......... 22

STANDARD OF REVIEW .......... 26

ARGUMENT .......... 27

I. Teva's ANDA conforms to the same-label requirement and different-manufacturer exception. .......... 27

A. The best reading of the statute permits generic manufacturers to make their own choices about formatting issues for their labels. .......... 27

B. FDA's interpretation aligns with judicial precedent and agency practice, which Vanda's reading contradicts. .......... 34

C. Vanda's "sameness" argument is self-contradictory as applied to use of braille in generic tasimelteon labels. .......... 43

II. Teva's ANDA complies with the FDCA's conditions-of-use requirement. .......... 44

A. The dispensing instructions Teva omitted at FDA's direction are not "conditions of use." ....................................45

B. Teva may omit conditions of use from the brand label. ..........48

III. FDA's approval of Teva's ANDA was not arbitrary or capricious.........................................................................................50

A. FDA did not change its position. ...........................................50

B. FDA fully considered potential safety questions and concluded the use of braille was not necessary. .......................51

C. FDA has treated generic tasimelteon manufacturers consistently.........................................................................54

IV. Under no circumstances is Vanda entitled to a vacatur remedy. .......55

CONCLUSION ..................................................................................57

CERTIFICATE OF COMPLIANCE ...................................................58

CERTIFICATE OF SERVICE ............................................................59

## TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Allied-Signal, Inc. v. NRC*,
988 F.2d 146 (D.C. Cir. 1993)....................56

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001)....................42

*Am. Great Lakes Ports Ass'n v. Shultz*,
962 F.3d 510 (D.C. Cir. 2020)....................56

*Ams. for Safe Access v. DEA*,
706 F.3d 438 (D.C. Cir. 2013)....................46

*Bondi v. VanDerStok*,
145 S. Ct. 857 (2025)....................34

**Bristol-Myers Squibb Co. v. Shalala*,
91 F.3d 1493 (D.C. Cir. 1996).......... 2, 3, 6, 8, 21, 23, 25, 35, 39, 40, 46, 49, 50

*Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*,
566 U.S. 399 (2012)....................5

*Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*,
439 F.3d 715 (D.C. Cir. 2006)....................52

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
589 U.S. 327 (2020)....................28

*Dist. Hosp. Partners, L.P. v. NLRB*,
141 F.4th 1279 (D.C. Cir. 2025)....................43

*Dubin v. United States*,
599 U.S. 110 (2023)....................32

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)....................51

---

* Authorities marked with an asterisk are those on which we chiefly rely.

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)..........................................................................................8, 46

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)........................................................................................28, 30

*FDA v. Wages & White Lion Invs., L.L.C.*,
145 S. Ct. 898 (2025)............................................................................................52

*Fogo De Chao (Holdings) Inc. v. DHS*,
769 F.3d 1127 (D.C. Cir. 2014)............................................................................51

*Gentiva Health Servs., Inc. v. Becerra*,
31 F.4th 766 (D.C. Cir. 2022)................................................................................27

*Hill Dermaceuticals, Inc. v. FDA*,
2012 WL 5914516 (D.D.C. May 18, 2012)..............................................................7

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..............................................................................19, 26, 34

*M'Culloch v. Maryland*,
17 U.S. 316 (1819)..........................................................................................29, 31

*Mich. Elec. Transmission Co. v. FERC*,
141 F.4th 1296 (D.C. Cir. 2025)..........................................................................3, 26

*Novartis Pharms. Corp. v. Becerra*,
2024 WL 4492072 (D.D.C. Oct. 15, 2024) ...........................................................35

*Orton Motor, Inc. v. United States Dep't of Health & Hum. Servs.*,
884 F.3d 1205 (D.C. Cir. 2018)............................................................................30

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
587 U.S. 601 (2019)...............................................................................................33

*Pharm. Mfg. Rsch. Servs., Inc. v. FDA*,
957 F.3d 254 (D.C. Cir. 2020)...............................................................................25

*PLIVA, Inc. v. Mensing*,
564 U.S. 604 (2011).........................................................................................23, 29, 51

*Ponce v. Billington*,
679 F.3d 840 (D.C. Cir. 2012)....................28

*Salix Pharms., Ltd. v. Norwich Pharms. Inc.*,
98 F.4th 1056 (Fed. Cir. 2024)....................41

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)....................34

*Thaler v. Perlmutter*,
130 F.4th 1039 (D.C. Cir. 2025)....................26, 27

*United States v. Bronstein*,
849 F.3d 1101 (D.C. Cir. 2017)....................33

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013)....................28

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)....................39

*Vanda Pharms. Inc. v. United States*,
174 Fed. Cl. 513 (2025)....................13

*ViroPharma, Inc. v. Hamburg*,
916 F. Supp. 2d 76 (D.D.C. 2013)....................46

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
529 U.S. 205 (2000)....................41

**Zeneca, Inc. v. Shalala*,
213 F.3d 161 (4th Cir. 2000).................... 6, 23, 30, 35, 36, 38, 39

**STATUTES:**

21 U.S.C. § 355

(a)....................5

(b)(1)....................5

(b)(1)(A)(vi)....................5

(d)....................46

(j)(2)(A) ... 29

(j)(2)(A)(i) ... 8, 24, 25, 45, 48

(j)(2)(A)(ii) ... 5

(j)(2)(A)(iv) ... 5, 30, 46

*(j)(2)(A)(v) ... 1, 5, 6, 18, 22, 23, 28, 29, 39

(j)(2)(A)(vii)(III) ... 40

(j)(2)(A)(vii)(IV) ... 40

(j)(2)(C) ... 6

(j)(3)(B) ... 49

Drug Price Competition and Patent Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) ... 4

**REGULATIONS:**

21 C.F.R. §

176.170 ... 47, 48

310.3(h)(5) ... 46

314.53(b)(1) ... 46, 49

314.70(c)(6)(iii)(C) ... 56

314.70(d)(2)(x) ... 56

314.94(a)(4)(i) ... 8

*314.94(a)(8)(iv) ... 6, 35, 40

314.97 ... 56

314.127(a)(7) ... 49, 50

54 Fed. Reg. 28,872 (July 10, 1989) ... 43

**OTHER AUTHORITIES:**

Brief for the United States as Amicus Curiae Supporting Respondents, *PLIVA, Inc. v. Mensing*, 2011 WL 741927 (U.S. Mar. 2, 2011) .......... 6, 25, 50, 51

FDA, *Acceptability of Draft Labeling to Support ANDA Approval: Guidance for Industry* (Oct. 2015), https://www.fda.gov/files/drugs/published/Acceptability-of-Draft-Labeling-to-Support-Abbreviated-New-Drug-Application-Approval--Guidance-for-Industry.pdf .......... 7

FDA Response to Butrans Citizen Petition, Docket No. FDA-2017-P-2230 (Sept. 7, 2017) .......... 36, 37

FDA-2023-P-0344 (Citizen Petition II) .......... 13

FDA-2023-P-1388 (Citizen Petition III) .......... 13

FDA-2023-P-1985 (Citizen Petition IV) .......... 13

Kurt R. Karst, *Vanda-lay Litigation Industries, Inc.: Taking Stock of Vanda Pharmaceuticals, Inc.'s Big Bets on Petitioning and Litigation Against FDA and the Federal Government*, FDA Law Blog (Oct. 2, 2024), https://tinyurl.com/mwtf8jdt .......... 13

*Require*, The American Heritage Dictionary (2nd College ed. 1985) .......... 28

*Require,* Random House Webster's Unabridged Dictionary (2d ed. 1997) .......... 28

*Require*, Webster's Ninth New Collegiate Dictionary (1984) .......... 28

*Require*, Webster's Third New Int'l Dictionary (1986) .......... 28

*Requirement*, Webster's Ninth New Collegiate Dictionary (1984) .......... 28

*Use*, Webster's Third New Int'l Dictionary (1986) .......... 45

## GLOSSARY OF TERMS

| | |
|---|---|
| ANDA | Abbreviated New Drug Application |
| AR | Administrative Record |
| FDA | Food and Drug Administration |
| FDCA | Federal Food, Drug, and Cosmetic Act |
| Hatch-Waxman Act | Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) |
| NDA | New Drug Application |
| RLD | Reference Listed Drug. The drug listed by FDA upon which an applicant relies in seeking ANDA approval |

## INTRODUCTION

This case presents a narrow question under the Federal Food, Drug, and Cosmetic Act: whether the manufacturer of a generic version of a drug may omit braille lettering voluntarily included on the label for the brand version while communicating identical content. The answer is yes. Under the FDCA, such formatting differences are permissible when they reflect the label-design choices of a generic manufacturer and do not compromise safety or efficacy.

Generic drug labels generally must mirror the content of the label for the corresponding brand because the premise of generic-drug approval is that the brand and generic are therapeutically equivalent. 21 U.S.C. § 355(j)(2)(A)(v). But a generic drug label is not required to match the brand in all respects. Under the statute's different-manufacturer exception, differences are permitted when "required … because the new drug and the listed drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v).

As the district court emphasized, the *content* of Teva's label "conveys the same information" as Vanda's label, listing the active ingredient (tasimelteon) and the strength (20 mg). JA25, 32-33. And despite Vanda's rhetorical commitment to "sameness," Vanda does not dispute that Teva, as a distinct tasimelteon manufacturer, could permissibly alter voluntary formatting features of the Hetlioz® label, such as the font, color scheme, and general layout. *See* Op. Br. 44-45. The

appeal thus presents the question whether FDA correctly concluded that the limited use of braille lettering (in addition to roman type) is a similarly permissible voluntary formatting variation under the statute. The district court rightly concluded that FDA's approval was lawful.

FDA's approval decision aligns with the best reading of the statute and the key phrase "required … because." It also follows consistent agency practice and judicial precedent upholding FDA's application of the different-manufacturer exception, including this Court's decision in *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1500 (D.C. Cir. 1996). By contrast, Vanda relies on a rigid and implausible interpretation that would require generic manufacturers to replicate every voluntary design feature of the brand label, even when those features are not necessary for safe use. That interpretation not only conflicts with text, precedent, and settled FDA practice, but it also cannot be reconciled with Vanda's concession that generic manufacturers may make their own choices about labeling font, color, and layout. In addition, Vanda's position is contradictory: Vanda purports to enforce a rule of sameness, but it wants Teva to use braille *differently* than in Vanda's label by depicting the active ingredient (tasimelteon) in braille even though Vanda uses only roman script for that item.

Vanda fares no better with its backup statutory argument, which asserts that Teva was required to repeat statements on Vanda's label associated with braille—

"Do not cover Braille" and "Dispense in original container"—even though Teva had omitted braille from its label. Vanda contends these statements were "conditions of use," and that Teva could not omit them from its label. But "conditions of use" refer to how, to whom, and for which purposes a drug product is administered; the pharmacy dispensing instructions at issue here do not qualify. Regardless, the relevant statutory provisions prohibit generic applicants from *adding* new conditions of use. They do not block generic applicants from *omitting* conditions of use where appropriate. *See Bristol-Myers*, 91 F.3d at 1500.

Finally, none of Vanda's scattered arbitrary and capricious challenges to FDA's approval decision come close to surmounting the highly "deferential" standard of review applicable to agency decision-making. *Mich. Elec. Transmission Co. v. FERC*, 141 F.4th 1296, 1303 (D.C. Cir. 2025). Vanda invents inconsistencies that do not exist and fails to seriously engage with the administrative record. That record demonstrates that FDA considered the safety claims for braille usage that Vanda puts forward and found the evidence lacking, particularly since "only 10% of the blind population" in the United States "actually read braille." JA684. Vanda provides no basis for the Court to second-guess FDA's considered safety judgment.

Vanda's attempt to weaponize a voluntary design element to block generic competition is not supported by law, logic, or the record. This Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether FDA's decision to approve a label for Teva's generic product that provides the same information as the brand label, but uses different formatting (roman script with no braille lettering) is consistent with the FDCA's same-labeling requirement and the different-manufacturer exception.

2. Whether FDA properly determined that Teva should omit statements that are irrelevant to its label (such as "Do not cover Braille") since the statements are not conditions of use that Teva is required to repeat.

3. Whether FDA acted within its discretion in determining that braille is not a necessary safety feature for Teva's label.

## STATEMENT OF THE CASE

### I. Statutory and Regulatory Background

The FDCA, as modified by the Drug Price Competition and Patent Restoration Act of 1984 ("the Hatch-Waxman Act"), Pub. L. No. 98-417, 98 Stat. 1585 (1984), and other later amendments, establishes the regulatory framework for the approval of prescription drugs. Before a manufacturer may "introduce or deliver for introduction into interstate commerce any new drug," it must submit

either a New Drug Application ("NDA") or an Abbreviated New Drug Application ("ANDA") and obtain FDA approval. 21 U.S.C. § 355(a).

An NDA must demonstrate that the drug is safe and effective for its intended use. 21 U.S.C. § 355(b)(1). It must include, among other things, "full reports of investigations" into safety and effectiveness; "a full list of the articles used as components"; and a "full description" of how the drug is manufactured, processed, and packed. *Id.* Brand manufacturers must also submit "specimens of the labeling proposed to be used" for the drug. *Id.* § 355(b)(1)(A)(vi).

By contrast, an ANDA is a streamlined application for generic versions of prescription drugs, which Congress established "to speed the introduction of low-cost generic drugs to market." *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405 (2012). Rather than duplicate clinical data confirming that a drug is safe and effective, an ANDA must "show[] that the generic drug has the same active ingredients as, and is biologically equivalent to, the brand-name drug" (generally referred to as the Reference Listed Drug or "RLD."). *Id.* (citing 21 U.S.C. § 355(j)(2)(A)(ii), (iv)). An ANDA generally must also "show that the labeling proposed for the new drug is the same as the labeling approved for" the brand-name drug. 21 U.S.C. § 355(j)(2)(A)(v). This same-label requirement "reflects the fundamental premise … that a generic drug can be relied upon as a

therapeutic equivalent of its RLD," and it is enforced "to preclude a basis for lack of confidence in the equivalency of generic versus brand name products."[1]

But Congress did not expect that generic drug labels would be literal copies of the brand label in every jot and tittle. Generic drugs may have different labeling content to reflect "changes required because of differences approved under a petition filed under [21 U.S.C. § 355(j)(2)(C)]," in which an ANDA seeks approval to differ from the corresponding brand drug in certain limited respects. 21 U.S.C. § 355(j)(2)(A)(v). And, as directly relevant here, divergences are allowed for changes "required … because the new drug and the listed drug are produced or distributed by different manufacturers." *Id.*

By regulation, FDA has identified a non-exhaustive list of examples that fall within the different-manufacturer exception, which include:

> differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity[.]

21 C.F.R. § 314.94(a)(8)(iv). Courts—including this one—have upheld FDA's application of the exception. *See, e.g.*, *Bristol-Myers*, 91 F.3d at 1500 (upholding FDA approval of generic labeling omitting an indication); *Zeneca, Inc. v. Shalala*,

---

[1] Brief for the United States as Amicus Curiae Supporting Respondents, *PLIVA, Inc. v. Mensing*, 2011 WL 741927, at *4 (U.S. Mar. 2, 2011) ("FDA *Mensing* Amicus Br.") (citation omitted).

213 F.3d 161, 169 (4th Cir. 2000) (upholding FDA's decision to allow a modified warning to account for a generic's formulation choice).

FDA has also recognized numerous other circumstances in which the different-manufacturer exception permits labeling differences. *See Hill Dermaceuticals, Inc. v. FDA*, 2012 WL 5914516, at *17 (D.D.C. May 18, 2012) (explaining that the regulation "merely provides some examples of labeling differences permitted under the statute"), *aff'd*, 709 F.3d 44 (D.C. Cir. 2013). For instance, "nearly all generic drug labeling differs from their respective RLD labeling in some aspect" related to "font, color, trade name, and other trade dress." JA921. FDA considers such differences "to be permissible differences due to different manufacturers." *Id.* Thus, during review of an ANDA, FDA does not ask whether the generic label's formatting perfectly mirrors the corresponding brand label; rather, it evaluates the "adequa[cy] from a safety perspective" of the generic manufacturer's own proposed "formatting factors," such as "the colors used" and "the font size and style used." FDA, *Acceptability of Draft Labeling to Support ANDA Approval: Guidance for Industry*, at 3 (Oct. 2015).[2]

In addition to the same-label requirement (with its exceptions), the FDCA requires generic applicants to "show that the conditions of use prescribed,

---

[2] https://www.fda.gov/files/drugs/published/Acceptability-of-Draft-Labeling-to-Support-Abbreviated-New-Drug-Application-Approval--Guidance-for-Industry.pdf.

recommended, or suggested in the labeling proposed for the new [generic] drug have been previously approved" by FDA for the brand drug. 21 U.S.C. § 355(j)(2)(A)(i); *see* 21 C.F.R. § 314.94(a)(4)(i) (similar). FDA interprets "conditions of use" to "refer to how, to whom, and for which purposes a drug product is administered." JA926. The phrase includes a drug's "indications" (*i.e.*, the approved treatment uses for the product) and "dosing regimen," "but does not include all contents of the drug product's labeling." JA926; *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 376 (2024) (describing the "conditions of use" applicable to brand and generic mifepristone in terms of the approved treatments and approved dosing regimen).

As described by this Court, the "conditions of use" provision "expresses the legislature's concern" that a new generic "be safe and effective for each indication that will appear on its label." *Bristol-Myers*, 91 F.3d at 1500. But the statute does not require generic applicants to repeat every condition of use approved for the brand—that "is a matter of indifference." *Id.*

## II. Factual Background and Procedural History

### A. Vanda secures FDA approval for Hetlioz® with labeling that includes limited use of braille.

This case concerns the drug tasimelteon, a compound that mimics the effects of melatonin by binding to and activating melatonin receptors. JA975-976. Vanda owns the NDA for Hetlioz®, which has tasimelteon as its active ingredient. In

2014, FDA approved Hetlioz® to treat Non-24-Hour-Sleep-Wake Disorder ("Non-24"), a circadian rhythm disorder that occurs when a person's circadian rhythm does not conform to a 24-hour period. JA916. Non-24 is common in those who cannot perceive light, such as the blind. JA916-917.

FDA has never required drug manufacturers to include braille lettering in product labels, and it did not do so for Hetlioz®. JA940, 942. Rather, Vanda voluntarily proposed to include braille for two items on its label: the brand name (Hetlioz®) and the product strength (20 mg). JA924. FDA never suggested that such use of braille was necessary to support the safe and effective use of Hetlioz®. That is not surprising: As Vanda itself noted in its application to FDA, "only 10% of the blind population actually read braille." JA684. But FDA recommended that Vanda conduct a label comprehension study to ensure that using braille would not "introduce a new risk of medication errors." JA924, 940.

Vanda completed the requested study. It reported that participants only correctly identified 5 out of 7 letters in "Hetlioz®," and that almost a quarter of participants (23%) were unable to correctly interpret "20 mg" in braille. JA690. Those results "misse[d]" Vanda's "lower bound target" for the study. *Id.* Nevertheless, FDA concluded the label was "acceptable" and permitted Vanda to include the braille as "nice to have" information. JA589, 590. But, as FDA later

explained, the study was not designed to and did "not establish that braille is necessary for the safe or effective use of the drug." JA950.

Because Vanda chose to include braille on the Hetlioz® label, FDA "recommend[ed]" that Vanda also "includ[e] a statement to dispense the product in the original container and to affix the pharmacy label so it does not cover the braille." JA678-679; *accord* JA917.

**B. FDA approves Teva's generic tasimelteon product.**

In 2018, Teva submitted an application to FDA to market a generic version of tasimelteon. JA623-629. Teva included a side-by-side comparison between its proposed labeling and the approved labeling for Hetlioz®, showing that Teva's label would omit the brand name Hetlioz® and incorporate additional differences, such as different corporate logos, marketing information, color scheme, and layout. JA602, 610-611, 918. Teva's submission also showed that its proposed label did not include braille lettering. JA582, 610-611.

In reviewing Teva's application, FDA's Division of Labeling Review (the office responsible for generic drug labeling decisions) sought comments from several different offices as to whether Teva's label should include braille. JA589. In response, two officials in the Office of New Drugs stated via email that they were "not sure" if blind patients "could use the product safely if they can't read the label" and speculated that "it might be less safe to not have braille." JA571,590.

The officials did not reference any studies on braille usage or display awareness of the low levels of braille comprehension among the blind population in the United States. Nor did the officials know that Vanda's label only used braille for two words. JA950-951. By contrast, the Medical Officer in the Office of New Drugs concluded that adding braille to Teva's label was *not* necessary for safety. The Medical Officer observed that braille is a "nice idea (and probably helps with public relations)," but is unnecessary for safe use, as evidenced by the fact that blind people are routinely prescribed other medicines that lack braille. JA590. The Office of Generic Drug Policy reached the same conclusion. JA591.

After "considering the totality of the views from the various subject matter experts" FDA "concluded that the omission of braille would not render the generic tasimelteon products less safe or effective," further noting that braille lettering was "not [a] condition of approval for" Hetlioz®. JA918 n.31; *see* JA589. Based on this conclusion, FDA instructed Teva to remove the two associated statements "Dispense in original container" and "Do not cover Braille" since they were "not … necessary" for a label without braille. JA582.

FDA approved Teva's ANDA in December 2022. JA623-629. FDA has also approved two other generic tasimelteon products, marketed by Apotex Corp. and MSN Pharmaceuticals Inc. JA917 n.29. Apotex's proposed label did not include braille while MSN's did. JA917-918.

### C. Vanda seeks to thwart generic competition by filing numerous lawsuits, injunction requests, and citizen petitions.

Before FDA's approval of generic tasimelteon products in December 2022, Vanda had the market to itself for over eight years. Such exclusivity was highly lucrative for Vanda, which generated profits of close to $200 million between 2018 and 2022 alone. JA56-57. Unsurprisingly, Hetlioz® was expensive, costing about $25,000 for a 30-day supply. JA55, 64-65.

Desperate not to relinquish its market position, Vanda used lawsuits and agency petitions to stifle generic competition. After Teva won a final judgment that Vanda's remaining listed patents for Hetlioz® were invalid or not infringed, Vanda sought emergency relief from the Federal Circuit to block Teva's launch (which the Court denied) while also filing a TRO request in a new district court (which Vanda later withdrew).[3] Vanda has pursued multiple new rounds of patent litigation against Teva raising duplicative patent claims, and it also filed a Lanham Act claim challenging Teva's marketing of generic tasimelteon.[4] On the regulatory front, Vanda has filed four citizen petitions to FDA (all denied) asking the agency

---

[3] *See Vanda Pharms. Inc. v. Teva Pharms. USA, Inc.*, No. 23-1247 (Fed. Cir. Dec. 15, 2022), ECF Nos. 2, 3; *Vanda Pharms. Inc. v. Teva Pharms. USA, Inc.*, 1:23-cv-00152-JLH (D. Del. Feb. 15, 2023), ECF No. 58.

[4] *Vanda Pharms., Inc., v. Teva Pharms. USA, Inc.*, No. 1:18-cv-00651-CFC (D. Del.); *Vanda Pharms. Inc. v. Teva Pharms. USA, Inc.*, No. 1:23-cv-00152-JLH (D. Del.); *Vanda Pharms. Inc. v. Teva Pharms. USA, Inc.*, No. 1:24-cv-01345-JLH (D. Del.); *Vanda Pharms. Inc. v. Teva Pharms., Inc.*, No. 1:24-cv-00018-JLH (D. Del.).

to rescind approval of generic tasimelteon products,[5] regularly filing suit against unfavorable FDA decisions.[6] Vanda even filed an (unsuccessful) damages claim in the Court of Federal Claims, alleging that FDA had taken its trade secrets during review of generic tasimelteon products.[7]

As directly relevant here, in January 2023, Vanda submitted a citizen petition demanding that FDA revoke approval of Teva's ANDA for tasimelteon and "order a recall of Teva's product." JA725, 915. Vanda relied primarily on the argument that Teva's product did not include braille on its container label. JA915, 920. Asserting that Teva's marketing of its generic product created "severe and immediate risks to public safety," Vanda asked for "immediate agency action withdrawing Teva's ANDA approval." JA726.

---

[5] JA725 (Citizen Petition 1); FDA-2023-P-0344 (Citizen Petition II) (challenging Apotex Inc. and Apotex Corp's ANDA); FDA-2023-P-1388 (Citizen Petition III) (challenging bioequivalence of Teva's generic tasimelteon product); FDA-2023-P-1985 (Citizen Petition IV) (challenging MSN's ANDA). Most recently, on June 30, 2025, FDA denied both Petitions III and IV. *See* FDA-2023-P-1985-0015.

[6] In addition to the instant case, Vanda filed suit against FDA to challenge approval of MSN's ANDA for tasimelteon. *Vanda Pharms. Inc. v. FDA*, 1:23-cv-02812-CRC (D.D.C.). These suits are just the tip of the iceberg: by one count, Vanda filed over 30 lawsuits against FDA or another government entity between 2019 and 2024. *See* Kurt R. Karst, *Vanda-lay Litigation Industries, Inc.: Taking Stock of Vanda Pharmaceuticals, Inc.'s Big Bets on Petitioning and Litigation Against FDA and the Federal Government*, FDA Law Blog (Oct. 2, 2024), https://tinyurl.com/mwtf8jdt.

[7] *Vanda Pharms. Inc. v. United States*, 174 Fed. Cl. 513 (2025), *appeal docketed*, No. 25-1434 (Fed. Cir. Feb. 12, 2025).

Unwilling to give FDA time to answer the petition, Vanda filed suit six days later in the U.S. District Court for the District of Columbia. After granting Teva's motion to intervene, the district court denied Vanda's motion for a preliminary injunction, holding that Vanda failed to show irreparable harm or establish that the balance of equities or public interest favored emergency relief. JA19.

### D. FDA denies Vanda's citizen petition.

In July 2023, FDA denied Vanda's citizen petition. JA916, 920. After a multi-office review of the petition's arguments, all reviewing offices unanimously agreed that Teva's labeling was lawful and did not raise safety concerns. JA933-967. Indeed, even the official within the Office of New Drugs who had expressed uncertainty about the issue, disavowed any concern "upon review of the evidence before the Agency, including Vanda's prior statement that only 10% of the blind population reads braille." JA963.

In its decision letter, FDA explained that the absence of braille depicting the proprietary name (Hetlioz®) and the strength (20 mg), as well as the omission of two associated statements—"Dispense in original container" and "Do not cover Braille"—were permissible differences based on the different-manufacturer exception. JA920. FDA noted that Vanda's "restrictive interpretation" to that exception was inconsistent with judicial precedent and established agency practice, including the agency's long-held view that "differences in font, color, trade name,

and other trade dress" are permitted. JA921. FDA also reasoned that Vanda's arguments were contradictory. As the agency explained, Vanda's label uses braille for its brand name (Hetlioz®) but not for the generic name (tasimelteon), whereas a generic label *must* omit the brand name, leaving only the generic name. JA922. Thus, at least some difference in braille usage was "inevitable": If Teva used braille for "tasimelteon," its label would differ from Vanda's, which printed "tasimelteon" only in roman script. JA923.

FDA also determined that the use of braille in generic labels was not necessary for safety. JA923-926. Noting that "only a small portion of blind and visually impaired individuals" in the U.S. "read braille," FDA reasoned that there are other methods to convey medicinal information to the blind community. JA924. Moreover, the information in braille on the Hetlioz® label is limited, consisting of only the brand name and product strength and excluding information like dosing instructions (*i.e.*, how many tablets to take) and warnings. *Id.* FDA explained that the Label Comprehension Study that Vanda provided with its NDA did not "establish that braille is necessary for the safe and effective use of [Hetlioz®]"; rather, it had merely been adequate to establish that adding braille would not "introduce a *new* risk of medication errors." JA923-924 (emphasis added); *see also* JA960 ("Because the Label Comprehension Study was not

designed to show that the braille reduced risk of medication errors, it did not contribute such data to the benefit-risk calculus.").

FDA was similarly unpersuaded by the single study Vanda referenced in its citizen petition, which was based on a survey of 215 self-selected participants in Saudi Arabia, 89% of whom could read braille. JA881-884. FDA found the study methodologically flawed due to selection bias: it was distributed via "a Google Docs link sent to participating blind associations and submitted to blind influencers on social network sites," which "raises the issue of selection bias." JA925 n.75. As one agency reviewer observed, "[t]here [wa]s no way to assess … whether [participants were] actually representative of the larger population of blind people of Saudi Arabia." JA966. Moreover, FDA questioned the study's relevance "given the low rate of braille literacy in the United States compared with that in Saudi Arabia." JA925 n.75; *see* JA966 (concluding that the "study is unlikely to be representative of the blind population in the U.S.," because while braille is "well recognized" in Saudi Arabia, "only 10% of the blind population" in the United States "actually read braille").

Finally, FDA noted that, despite Vanda's predictions of immediate safety problems, the agency had not received *any* "adverse event reports or medication error reports related to the exclusion of braille or braille-related statements" in the 18 months since Teva's approval or identified *any* "indication from [FDA's

Adverse Event Reporting System] data or periodic safety reports" that the omission of braille will lead to patient confusion or medication errors. JA925-926; *see also* JA943-944, 955-956, 963. To the agency, this record confirmed that Vanda's asserted safety concerns about "the potential for product mix-ups" were "speculative and unsupported." JA926.

Having determined that generic tasimelteon applicants like Teva do not need to include braille in their labels, FDA likewise concluded that inclusion of the associated statements "Dispense in original container" and "Do not cover Braille" were "irrelevant and unnecessary." JA926. Indeed, inclusion of such statements "could be misleading" since Teva's label does not use braille. JA926. FDA also concluded that the omitted statements were not conditions of use: they do not address "how, to whom, or for what purpose" the product is administered. JA926.

**E. The district court grants summary judgment to FDA and Teva.**

Once FDA denied Vanda's citizen petitions, Vanda amended its complaint to challenge that denial. JA83. The parties cross-moved for summary judgment, and the district court ruled in favor of FDA and Teva. JA12.

Starting with Vanda's statutory arguments, the district court emphasized that, despite Vanda's rhetoric, the case presented "only the following, limited question: If a pioneer drug label includes a voluntary element that is not necessary for safety, can FDA approve a generic version of that label that chooses not to

adopt the voluntary element but still conveys the same information?" JA25; *see* JA32-33 ("[T]his case concerns only a change to a label's form, not its content—and the form itself was voluntary."). "Reading the different-manufacturer exception's text in accordance with its statutory context, purpose, history, and precedent," the district court concluded that the answer is yes: Teva's decision to convey the active ingredient (tasimelteon) and strength (20 mg) only in roman typeface is permissible. JA25.

The district court began with the text of the different-manufacturer exception, which applies when a change is "required … because the new drug and the listed drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v). The court recognized that "required" and "because" have a range of plausible meanings. For example, although "require" may mean "need[ed]" or "necessary," it "can also mean 'suitable or appropriate in a particular case.'" JA23 (citations omitted). Likewise, "'because' is typically understood in statutes to indicate only 'but-for' causation," meaning a difference in manufacturer need not be the "sole" cause of a label change. *Id.* (citation omitted) Vanda, by contrast, argued for a more restrictive meaning that would limit permissible changes to those dictated by "the presence of a different manufacturer." *Id.* (citation omitted).

But the district court explained that, despite the parties' dispute, they "rightly agree[d]" that the statutory context here provides limits on "the full spectrum of the exception's possible meanings." JA24. On one end, the exception does not authorize "any change that FDA elects to approve." *Id.* "[A]t the other end of the spectrum" all parties agreed the exception permits changes corresponding to "allowable product differences" and "changes to the label that reflect optional choices by the generic manufacturer," such as "tinkering with label colors or font." *Id.* (brackets and citations omitted). Drawing from this consensus, and considering the text in context, the district court concluded the statute permits generic manufacturers to make their own "permissible design choices" that present the same content as the brand label and are "shown to maintain the drug's safety and effectiveness." JA29; *see* JA25-27.

The district court observed that its interpretation aligns with consistent FDA decisions approving comparable label variations under the different-manufacturer exception, which "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." JA26-27 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)). Indeed, numerous courts have approved such previous FDA decisions, with a "through-line" permitting "approval of generic labels with changes resulting from the generic manufacturer's

otherwise permissible design choices and shown to maintain the drug's safety and effectiveness." JA27-29.

As the district court recognized, although Vanda purported to accept these decisions and FDA practice, they contradicted Vanda's interpretation. JA30. For example, Vanda's argument that generic manufacturers must match the brand label exactly if "possible" to do so "does not account for … label changes [Vanda] concedes are permissible," including "modifications that (like braille) alter the presentation—but not content—of information on the label, such as 'color or font.'" JA30-31 (citation omitted). The district court rejected Vanda's rationalization that such formatting differences are required by legal protections for trade dress, explaining that FDA "is not in a position to" (and does not) "parse legally necessary font and color changes from merely voluntary ones." JA31. The court similarly rejected Vanda's suggestion that such formatting differences could be ignored as "de minimis," which Vanda contrasted with omission of braille. JA32. As the district court noted, "FDA disagrees with both assessments": "[i]t considers font important enough" to be the subject of regulations and guidelines, whereas FDA determined braille is not needed for the safe and effective use of tasimelteon. *Id.*

The district court similarly rejected Vanda's contention that omitting the "Dispense in original container" statement violates the FDCA's conditions-of-use

requirement.[8] The court reasoned that "the term 'conditions of use' denotes the circumstances that are essential to the consumption or taking of the drug"—*i.e.*, "how, to whom, and for what purpose the drug is administered." JA35 (citation omitted). Applying this understanding, the court concluded the statement did not qualify as a condition of use because it merely "gives instructions to pharmacies for delivering the drug." *Id.* Alternatively, the district court reasoned that even if "Dispense in original container" were a condition of use, generic labels could still omit that statement. As the court explained, the statute "requires that all conditions of use included on the generic label be previously approved," but it "does not necessarily require the converse," *i.e.*, "that all previously approved conditions of use be included on the generic label." JA36 (citing *Bristol-Myers*, 91 F.3d at 1500).

Finally, the district court rejected Vanda's arbitrary-and-capricious challenge. JA37-40. The court disagreed that FDA had unlawfully changed its position on generic labeling, noting that Vanda's argument relied on an FDA amicus brief that expressly had not addressed the different-manufacturer exception. JA37. The district court also concluded that FDA considered all the evidence regarding the safety of Teva's label, during both approval and the citizen-petition

[8] Vanda did not separately challenge omission of the "Do not cover Braille" statement in summary judgment briefing, so the court did not address it.

process. JA38. In particular, FDA considered the one "internal comment expressing uncertainty" about safety—a comment later "withdrawn" by the relevant official. *Id.* The court refused to substitute its own judgment on these matters, noting that the agency had identified methodological flaws in "the sole study cited in the citizen petition" and that Vanda's attempt to introduce new studies in litigation was procedurally improper. JA39.

## SUMMARY OF ARGUMENT

**I.** Teva's product label, which describes the active ingredient and product strength in roman script, is consistent with the statutory same-labeling requirement and the different-manufacturer exception. FDA's decision approving a generic label with the same content as Vanda's label, but dispensing with a voluntary formatting feature, aligns with the statutory text, agency practice, and judicial precedent. By contrast, Vanda's restrictive interpretation contradicts settled FDA practices that Vanda purports to accept and is internally inconsistent.

**A.** The different-manufacturer exception has two key terms that must be interpreted as part of a complete phrase: "required" and "because." 21 U.S.C. § 355(j)(2)(A)(v). "Required" can mean "suitable or appropriate," and "because" typically invokes but-for causation, not sole causation. When these terms are put together, they are best understood to contemplate label changes that are suitable or appropriate and would not exist but-for the fact the products are "produced or

distributed by different manufacturers." *Id*. Changes that misleadingly imply the brand and generic products are therapeutically different are not permitted. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 613-614 (2011). But using different formatting (*e.g.*, font, color, or layout) to present the same content is permissible. The decision whether to use braille fits comfortably within this framework.

**B.** FDA regulations and practice, and judicial decisions upholding FDA decisions, confirm that the different-manufacturer exception encompasses a range of permissible differences. Many of these accepted differences contradict Vanda's interpretation of "required" because they are not "obligatory" in the sense of being unavoidable. For example, generic manufacturers may alter warnings to account for permissible differences in product formulation, even if the formulation change is optional. *See Zeneca*, 213 F.3d at 169-70. Generic manufacturers also may omit indications or other information as part of a strategy to avoid the brand's patent claims or other exclusivities. *See Bristol-Myers*, 91 F.3d at 1500. And "nearly all generic drug product labeling differs from their respective RLD labeling in some aspect" related to "font, color, trade name, and other trade dress." JA921.

Vanda's attempts to reconcile its interpretation with FDA practices it cannot plausibly challenge are unprincipled and unworkable. Vanda suggests allowances should be made only for product differences resulting from voluntary manufacturing decisions. But there is no statutory basis for that *ad hoc* limitation,

and it cannot account for well-established labeling policies, such as generic manufacturers' ability to modify label formatting without changing content. Vanda's contention that all such changes are required by intellectual property law is inaccurate and divorced from FDA practice.

**C.** Vanda's application of the different-manufacturer exception is also contradictory. Vanda did not use braille lettering to describe the active ingredient (tasimelteon), but it now insists Teva must do so. Vanda's approach thus seeks to introduce a new *difference* between the Vanda and Teva labels, while purporting to defend a rigid mandate for *sameness*. The incoherence of that position further illustrates the unworkability of Vanda's approach.

**II.** Vanda's claim that Teva's omission of "Do not cover Braille" and "Dispense in original container" violates the statute's "conditions of use" requirement is meritless. The statute directs that the "conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved" for the brand drug. 21 U.S.C. § 355(j)(2)(A)(i). As FDA has explained, "conditions of use" refers to how, to whom, and for which purposes a drug product is administered—not how it is dispensed by a pharmacy. The statements that Teva omitted (at FDA's direction) do not pertain to how tasimelteon is used or administered.

In any event, the statute only prohibits generic manufacturers from including "conditions of use" that have not been "previously approved." *Id.* Whether a generic manufacturer omits conditions of use in the brand label "is a matter of indifference" under this statutory provision. *Bristol-Myers,* 91 F.3d at 1500.

**III.** Vanda's various arbitrary-and-capricious challenges to FDA's approval decision come nowhere close to overcoming the deferential standard of review applicable.

**A.** Vanda contends that FDA failed to acknowledge its change in position from that described in an amicus brief in *Mensing*. But the *Mensing* brief addressed *content* differences between brand and generic labels, not formatting issues. And the brief expressly did not engage with the different-manufacturer exception at issue here. There was no change in agency position.

**B.** Vanda attacks FDA's safety determination, arguing the agency failed to account for safety questions raised by some officials and insisting FDA should have credited studies that Vanda now features. But FDA appropriately "consider[ed] the totality of the views from the various subject matter experts" within multiple agency offices, and arrived at its decision "[a]fter careful deliberation." JA918; JA951. Vanda provides no basis for this Court to second-guess FDA's scientific judgment on safety. *See Pharm. Mfg. Rsch. Servs., Inc. v. FDA*, 957 F.3d 254, 262 (D.C. Cir. 2020).

**C.** There is no merit to Vanda's argument that FDA treated similarly situated entities differently, since one generic manufacturer (MSN) included braille on its label while Teva did not. FDA applied the same rule to every manufacturer: braille is an optional formatting feature.

**IV.** In no event should the Court order vacatur of Teva's approval. Even if an error in FDA's decision were identified, vacating approval of a drug product that has been on the market for years would be disruptive, whereas any labeling error could easily be corrected through FDA's labeling-amendment process. FDA and Teva raised arguments against vacatur in the district court, which had no occasion to consider them because it rejected Vanda's challenge. If this Court were to reverse, it should remand to let the district court address remedy.

## STANDARD OF REVIEW

This Court reviews "a district court's grant of summary judgment in a case concerning agency action *de novo*." *Thaler v. Perlmutter*, 130 F.4th 1039, 1044 (D.C. Cir. 2025). Courts exercise independent judgment when interpreting a statute, though they may "seek aid from the interpretations of those responsible for implementing particular statutes." *Loper Bright*, 603 U.S. at 394. The standard of review for assessing whether an agency decision is arbitrary or capricious is "deferential to the agency." *Mich. Elec. Transmission*, 141 F.4th at 1303 (citation omitted).

# ARGUMENT

## I. Teva's ANDA conforms to the same-label requirement and different-manufacturer exception.

Teva's label describing the active ingredient and strength of its generic product using only roman script is permitted by the best reading of the FDCA and aligns with longstanding agency practice and judicial precedent. Vanda's contrary arguments ignore the distinction between label content and formatting, while relying on result-driven rationalizations. There is no basis for treating Vanda's voluntary choice to use braille as binding generic manufacturers, even as all concede that different manufacturers are free to make their own choices about other aspects of labeling design and presentation, such as font, color, and layout. The Court should affirm the district court's judgment and reject Vanda's challenge to FDA's application of the different-manufacturer exception.

### A. The best reading of the statute permits generic manufacturers to make their own choices about formatting issues for their labels.

1. "In addressing a question of statutory interpretation, [courts] begin with the text." *Gentiva Health Servs., Inc. v. Becerra*, 31 F.4th 766, 775 (D.C. Cir. 2022) (citation omitted). "The judicial task when interpreting statutory language … is to discern how Congress used a word in the law." *Thaler*, 130 F.4th at 1048. To do so, "the words of a statute must be read in their context and with a view to

their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation omitted).

The different-manufacturer exception has two key terms, which appear together: "required" and "because." 21 U.S.C. § 355(j)(2)(A)(v). The term "because" is "often associated with but-for causation." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 335-336 (2020). But-for causation signifies that "the [effect] would not have occurred in the absence of—that is, but for—[the cause]." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346-347, 350 (2013) (citation omitted). But-for causation permits multiple causes. In other words, "'because of' does not mean 'solely because of.'" *Ponce v. Billington*, 679 F.3d 840, 846 (D.C. Cir. 2012) (citation omitted).

As the district court recognized, the term "required" has multiple definitions. It can mean "need[ed]" or "necessary." JA23 (citing *Require*, Webster's Third New Int'l Dictionary 1929 (1986)). But it is also commonly understood to mean "suitable or appropriate in a particular case." *Require*, Webster's Third New Int'l Dictionary 1929 (1986).[9] These definitions are not inconsistent; they show that "required" contemplates a range of logical relationships, depending on context.

---

[9] *See also Require*, Webster's Ninth New Collegiate Dictionary 1002 (1984) ("to call for as suitable or appropriate"); *id.* at 1002 (defining "requirement" as "something wanted or needed"); *Require*, The American Heritage Dictionary 1050 (2nd College ed. 1985) ("To call for as fitting"); *Require,* Random House Webster's Unabridged Dictionary 1636 (2d ed. 1997) ("need or occasion for").

Indeed, in certain contexts, even a term like "necessary" has (famously) been understood to mean "no more than that one thing is convenient, or useful, or essential to another." *M'Culloch v. Maryland*, 17 U.S. 316, 413 (1819).

When the terms "required … because" are put together in the context of this statute, they are best understood to contemplate label changes that are suitable or appropriate accommodations for the fact that the products are "produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v). Changes that imply the brand and generic products are therapeutically distinct are impermissible, which is why generic labels typically cannot add or omit safety information about the active ingredient contained on the brand's label. *See Mensing*, 564 U.S. at 613-614. Such content-based differences for products with the same active ingredient are not "required … because" they are manufactured or distributed by different manufacturers. 21 U.S.C. § 355(j)(2)(A)(v). By contrast, changes resulting from a manufacturer's discretionary choices about how best to formulate, package, or market its product fall within the exception's scope.

The statutory structure reinforces this understanding. Generic manufacturers must ensure their ANDA products are the "same" as the corresponding brand in certain respects, such as with respect to the active ingredient, dosage form, strength, and route of administration. 21 U.S.C. § 355(j)(2)(A). But the statute and FDA regulations allow certain differences. For example, generic

manufacturers may use different inactive ingredients than the brand product, so long as the brand and generic products are "bioequivalent." *Id.* § 355(j)(2)(A)(iv); *see also Zeneca*, 213 F.3d at 164 (discussing FDA regulations addressing permissible differences for inactive ingredients); JA26.

A generic manufacturer that chooses to use different inactive ingredients than the brand may need to alter its label to reflect those differences. *See Zeneca*, 213 F.3d at 169-170. Such a label variation is not dictated by the difference in manufacturer identity: the generic could use the same inactive ingredients as the brand, avoiding the need to alter its label. But the labeling difference is allowed under the different-manufacturer exception because it is a suitable accommodation of a different manufacturer's formulation choice.

By logical extension, a generic manufacturer's voluntary choices about labeling presentation (rather than content) also fit within the different-manufacturer exception. Indeed, as the district court recognized, "[i]t would be aberrant to read the FDCA as permitting safe variation in a generic drug's substance, but not in its label." JA26. In fact, the type of label formatting change at issue here is itself downstream of a voluntary manufacturing difference, since printing a label to include braille would require distinct equipment. The statute should instead be read "as a symmetrical and coherent regulatory scheme." *Brown & Williamson*, 529 U.S. at 133 (citation omitted); *see also Orton Motor, Inc. v. United States*

*Dep't of Health & Hum. Servs.*, 884 F.3d 1205, 1212 (D.C. Cir. 2018) (reading statute to "preserve[] the integrity of the statutory scheme and reconcile[] the provisions within it").

2. Vanda reads the different-manufacturer exception more restrictively. Focusing on "required" in isolation, Vanda contends that the statute only permits labeling changes that are "obligatory" based on manufacturer difference. Op. Br. 28. As Vanda described its position below, on its view, the different-manufacturer exception "authorizes *only* those labeling changes when *the presence* of a different manufacturer in fact requires the change." JA30-31 (quoting JA455) (emphasis altered in district court opinion). Under this test, because Teva theoretically could have used braille in its tasimelteon label, it was obligated to do so. *See* Op. Br. 28-29.

This interpretation relies on one possible meaning of "required" out of many, while ignoring context and the ordinary meaning of "because." As discussed, *see supra* p. 28, "required" can mean "suitable or appropriate"; even the term "necessary," which Vanda regards as a synonym of "required," can encompass being merely "convenient" or "useful." *M'Culloch*, 17 U.S. at 413. And "because" typically means that a factor was *one* cause of a result, not the *sole* cause. *See supra* p. 28. Yet Vanda would limit the phase "required … because" only to those instances where the presence of a different manufacturer alone

dictates a label change. Vanda does not justify its restrictive reading, which conflicts with the ordinary meaning of "required … because" when considered together as a phrase. *See, e.g.*, *Dubin v. United States*, 599 U.S. 110, 120 (2023) (courts must read "the whole phrase" to discern statutory meaning).

Consider the sentence: "The team's playbook will stay the same, except for changes required because there is a new coach." An ordinary speaker of English would understand the phrase to encompass changes the new coach *elected* to make. Or consider the sentence: "The home's layout will remain the same, except for changes required because there is a new baby." Ordinary speakers again would understand the phrase to refer not only to obligatory changes (*e.g.*, adding a bassinet, crib, or other place for the baby to sleep), but also voluntary ones appropriate to the baby's arrival (*e.g.*, furnishing a nursery and decorating the walls). As these examples show, the natural meaning of "required … because" encompasses changes that logically follow from a voluntary choice fit to the circumstances, rather than being limited to changes that are strictly mandatory.

Contrary to Vanda's argument, Op. Br. 30, this interpretation of "required … because" does not read "required" out of the statute. As all agree, "required" is susceptible to different meanings. *See id.* at 31 (acknowledging the "multiple definitions" of "required"); JA24. When "two terms standing alone do not resolve the question" before the Court, they "should be read together and interpreted in

light of the entire statute." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 609 (2019); *see also United States v. Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017) (recognizing that phrases sometimes overlap). Reading "required … because" together gives effect to both terms, and it helps to inform the meaning of "required" in context.

In passing, Vanda insists, Op. Br. 31-32, that even if "required … because" means "suitable or appropriate in a particular case," Teva still was required to use braille because Teva's "target patient population skews *more* heavily towards blind people than Vanda's." Vanda never raised this argument previously, either to FDA in its citizen petition or to the district court; it is thus both unexhausted and forfeited. JA732-735; *see generally* JA132, 445. In any event, Vanda's assertion that the use of braille is necessary "to treat non-24," Op. Br. 32, even though only 10% of the blind population reads braille, contradicts FDA's expert judgment. *See infra* pp. 51-54. The exclusive use of roman script in Teva's label is "suitable or appropriate" because it reflects a manufacturer-specific formatting choice, in the same manner as a color scheme or font choice. As an FDA reviewer noted, Vanda could reasonably have chosen to use braille because, even though it is unnecessary for safety, it plausibly "helps with public relations." JA590. But Teva could make a different marketing judgment. The different-manufacturer exception does not require FDA to micromanage a manufacturer's label design and formatting choices

if the agency concludes those choices do not compromise safety and efficacy.

### B. FDA's interpretation aligns with judicial precedent and agency practice, which Vanda's reading contradicts.

FDA's decision to approve Teva's label is consistent with agency regulations implementing the statute and general agency practice. As the district court recognized, although FDA's statutory interpretation "lacks power to control," it provides instructive "guidance" that may inform the Court's decision. JA27 (brackets and citation omitted); *see also Bondi v. VanDerStok*, 145 S. Ct. 857, 874 (2025) ("[T]he contemporary and consistent views of a coordinate branch of government can provide evidence of the law's meaning."). Indeed, as discussed below, both this Court and the Fourth Circuit have upheld applications of the different-manufacturer exception that align with FDA's decision here and conflict with Vanda's interpretation. *See infra* pp. 35-36.[10]

1. FDA regulations identify several examples of permissible variations under the different-manufacturer exception, which includes "differences in expiration date, formulation, bioavailability, or pharmacokinetics," as well as the "omission of an indication or other aspect of labeling protected by patent" or a

---

[10] In passing, Vanda asserts, Op. Br. 41, that respect for agency interpretations under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) is "cabined to factbound determinations" and is inapplicable here. That is plainly wrong. The Supreme Court in *Loper Bright* recognized and reaffirmed the long tradition of "according due respect to Executive Branch interpretations," which is not limited strictly to factual judgments. 603 U.S. at 385; *accord VanDerStok*, 145 S. Ct. at 874.

regulatory exclusivity. 21 C.F.R. § 314.94(a)(8)(iv). Many of these labeling differences are not dictated by the mere presence of a different manufacturer (*e.g.*, the manufacturer's name and the drug code). Rather, they are the result of choices left open by the statute, such as varying the product's formulation (without compromising bioequivalence) or omitting an indication from the generic label to avoid the brand's exclusivity.

Courts have consistently upheld FDA's understanding of the different-manufacturer exception reflected in agency regulations. For example, in *Bristol-Myers*, this Court held that FDA permissibly approved an ANDA label under the different-manufacturer exception that omitted indications present in the brand label. 91 F.3d at 1500. This Court reasoned that FDA's interpretation best aligns with the statutory structure. *See id.*; *see also Novartis Pharms. Corp. v. Becerra*, 2024 WL 4492072, at *7 (D.D.C. Oct. 15, 2024) (explaining that *Bristol-Myers* remains "good law in the wake of *Loper Bright*," as "the D.C. Circuit relied on its own interpretation"), *appeal docketed*, No. 24-5235 (D.C. Cir. Oct. 15, 2024).

Likewise in *Zeneca,* the Fourth Circuit upheld FDA's decision to approve an ANDA with a label incorporating a warning for an inactive ingredient (sulfite) that was not in the brand product and thus not mentioned in the brand label. 213 F.3d at 166. The court concluded that this labeling difference was allowed under the different-manufacturer exception, explaining that "a difference in preservative is a

permitted variation in formulation" and that FDA could "allow corresponding differences in labeling to identify the preservative and provide any appropriate warnings." *Id.* at 169.

Beyond the examples mentioned in regulations, FDA has repeatedly approved label variations that reflect permissible, manufacturer-specific choices without suggesting therapeutic difference. For example, when a brand manufacturer voluntarily chose to obtain halal and kosher certifications and feature them on its label, FDA let a generic manufacturer omit those certifications. JA921.[11] Similarly, FDA concluded that a generic manufacturer of a transdermal patch was not required to adopt an optional disposal system employed by the brand and described on the brand label. *Id.*; *see* FDA Response to Butrans Citizen Petition, at 2, 8, 10, Docket No. FDA-2017-P-2230 (Sept. 7, 2017). Explaining that the disposal instructions were "voluntary" and "unnecessary for the safety of the product," FDA reasoned that the generic manufacturer could adopt its own system and that "the omission of labeling describing the Patch-Disposal Unit is the kind of labeling difference that may be permissible as a consequence of the fact

[11] Vanda speculates, Op. Br. 44, that "presumably" the generic drug "was not halal or kosher," which required a change "to the generic label to make it truthful." But Vanda provides no support for that speculation, nor is there any basis to suggest that FDA would have regarded such a distinction as relevant.

that the [brand drug] and the generic are produced or distributed by different manufacturers." *Id.* at 10.

Perhaps most closely analogous to the issue presented here, FDA has always "considered differences in font, color, trade name, and other trade dress to be permissible differences due to different manufacturers." JA921-922. Those variations are often optional—a generic manufacturer is not *obligated* to choose a different font than the brand, for example. But "nearly all generic drug product labeling differs from their respective [brand] labeling in some aspect" related to formatting and presentation. JA921. Notably, Vanda tried to argue otherwise in its petition to FDA, contending that "the same-labeling requirement routinely applies to the words of a label *as well as their form*," requiring uniformity on matters such as use of "bold-face or italics." JA732-733 (emphasis added); *see also* JA922 n.56 (noting this argument by Vanda and rejecting it). But Vanda conspicuously abandoned that argument in litigation because it is contrary to FDA practice. *See* JA32 n.2 (noting the "change" in Vanda's position).

Teva's decision to describe the active ingredient and strength of its product using only roman typescript is legally indistinguishable from these other acceptable formatting variations. Just as Teva could choose, for example, to use Century instead of Garamond for its font, or to place the active ingredient and strength on the left side of the label rather than in the center, Teva also could elect

to use only roman typeface without braille since Vanda's limited use of braille was voluntary and not necessary for safety. JA923-926.

2. As both FDA and the district court recognized, Vanda's proposed "restrictive interpretation" of the different-manufacturer exception "is inconsistent" with FDA regulations and practice. JA921; *see* JA30. Although Vanda cryptically suggests it *might* disagree with unidentified aspects of FDA's historic approach, Op. Br. 42, it never identifies a single approval decision it believes was wrong. Instead, Vanda insists that its interpretation of the different-manufacturer exception accommodates FDA precedent while yielding a different outcome only for the braille issue presented here. But Vanda's arguments rely on *ad hoc* distinctions that are unprincipled and unworkable.

To start, Vanda contends that the *Zeneca* decision discussed above (involving the sulfite warning) "aligns with" Vanda's "reading of the different-manufacturer exception," which permits "differences that 'directly result' from a 'permitted variation' in the manufacturing process." Op. Br. 38 (quoting *Zeneca*, 213 F.3d at 169) (brackets omitted). Vanda concedes that generic manufacturers may adjust their labels to reflect product differences caused by voluntary manufacturer decisions, but insists they cannot make any such decisions about the formatting of the labeling itself. *See id.* at 38-39. As the district court recognized,

however, "there is no basis in the different-manufacturer exception's text for the carve-out [Vanda] proposes." JA31.

The statute allows labeling variations "required … because the new drug and the listed drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v). Using Vanda's proposed interpretation, it was not "obligatory," Op. Br. 1, for the generic manufacturer in *Zeneca* to include a sulfite warning merely because it was not the brand—that resulted only because the generic *chose* to use sulfites in its formulation. 213 F.3d at 165. Vanda observes that FDA must allow generic manufacturers to modify their labels based on a "'permitted variation' in the manufacturing process" because "[o]therwise, that permissible variation would be pointless." Op. Br. 38 (citation omitted). True, but that supports FDA's (and Teva's) reading, not Vanda's. The fact that Vanda's interpretation undermines the statute's structure does not justify an *ad hoc*, atextual exception—it shows why Vanda's interpretation is wrong. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) (rejecting an agency's effort to adopt an unprincipled exception to avoid the implausible consequences of its interpretation).

In addition, Vanda's interpretation cannot account for labeling variations that FDA (and this Court) have concluded are permitted by the different-manufacturer exception but do not result from any product-based difference. For example, in *Bristol-Myers*, the generic manufacturer's decision to omit indications

included in the brand label had nothing to do with any product-based difference. 91 F.3d at 1496. Vanda nonetheless insists, Op. Br. 39, that the "difference in labeling" in *Bristol-Myers* "necessarily followed from an upstream manufacturer difference" and was "required" because the omitted indications were protected by a brand manufacturer's exclusivity rights. But that does not mean the generic manufacturer was "obligated" to omit the additional indications. A generic may choose to include all the approved indications on its label and potentially wait longer for final approval.

Moreover, the same FDA regulation at issue in *Bristol-Myers* allows generic manufacturers to omit "an indication or other aspect of labeling" from the brand "protected by patent." 21 C.F.R. § 314.94(a)(8)(iv). In that context, generic manufacturers plainly have options. They could include all approved indications on their label while agreeing to delay approval for their product until after the relevant patents expire. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(III). Or they could certify that the relevant patents are invalid or not infringed, which could allow for approval to market the generic product for all indications subject to the outcome of the patent suit. *Id.* § 355(j)(2)(A)(vii)(IV). Vanda concedes, Op. Br. 43, that the different-manufacturer exception permits carveouts to avoid patent claims. But once again, Vanda is making an *ad hoc* exception that undermines its interpretation. Generic manufacturers are not "obligated" to omit indications from

their labels to avoid the brand's patent claims, as frequent patent litigation under the Hatch-Waxman Act illustrates, in which generic manufacturers fully mirror the brand's label and challenge method of use claims. *See, e.g.*, *Salix Pharms., Ltd. v. Norwich Pharms. Inc.*, 98 F.4th 1056, 1060 (Fed. Cir. 2024).

Finally, as the district court recognized, *see supra* p. 20, Vanda's interpretation "does not account for another set of label changes that it concedes are permissible: modifications that (like braille) alter the presentation—but not content—of information on the label, such as 'color or font.'" JA31. Trying to avoid this contradiction, Vanda suggests, Op. Br. 44-45, such variations are "required" because they are "made to comply with intellectual property laws or to avoid misleading statements." But that assertion is overbroad.

Not every formatting or design feature of a drug label is protectable trade dress. To be protectable, features must be non-functional and distinctive to the manufacturer's product, with their reproduction by a competitor "likely to cause confusion." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000). Drug manufacturers make numerous design choices with their labels, including not only color and typeface, but also layout (*e.g.*, where on the label certain information appears). As an illustration, the Vanda and Teva labels have numerous formatting differences apart from the usage of braille, which Vanda has

never challenged. It cannot seriously be argued that every such change was needed to avoid infringing Vanda's intellectual property.




JA837 (Vanda's label); JA853 (Teva's label).

In any event, Vanda's attempt to reconcile its restrictive interpretation with FDA's historic treatment of label formatting is divorced from agency practice. FDA "lack[s]" the "expertise and resources" to adjudicate disputes about intellectual property, *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1080 (D.C. Cir. 2001), making it impractical for the agency to decide whether a generic manufacturer was *obligated* to alter details of color scheme, font, and layout to avoid trade dress protections or merely chose to do so. Moreover, in contrast to the statutory process for patent listing, brand manufacturers do not make "representations" to FDA about the scope of trade-dress rights associated with their labeling, meaning there is nothing for the agency to "accept at face value." Op. Br. 45 (brackets and citation omitted). Vanda's suggestion that FDA can just *presume* formatting features for the brand label are all protectable trade dress is a result-driven invention—the proposal has no basis in the statute, and Vanda does not

explain how FDA would distinguish features like braille from color, font, or other design choices when applying such a presumption.[12]

### C. Vanda's "sameness" argument is self-contradictory as applied to use of braille in generic tasimelteon labels.

Vanda's application of the different-manufacturer exception is contradictory. Despite purporting to ground its objections to Teva's label in an obligation for "sameness," Vanda urges that Teva should have adopted a formatting *difference*.

Recall that Vanda's label uses braille for two items: the brand name (Hetlioz®) and the strength (20 mg). *See supra* p. 9. Vanda's label does *not* use braille to describe the active ingredient (tasimelteon). All agree that Teva had to omit the name Hetlioz® from its label (in both braille and roman script). *See* Op Br. 29; *see also* 54 Fed. Reg. 28,872, 28,884 (July 10, 1989) (different-manufacturer exception encompasses differences in "the name and address of the manufacturers of the proposed and listed drug products"). But inexplicably, Vanda insists, Op. Br. 18-19, 29, that Teva should have *added* braille lettering for the word "tasimelteon," creating a new difference between the labels.

---

[12] In a footnote, Vanda suggests that "small changes like a variation in font" could alternatively be allowed under a *de minimis* exception to the same-label requirement. Op. Br. 45 n.4. The Court "need not consider cursory arguments made only in a footnote." *Dist. Hosp. Partners, L.P. v. NLRB*, 141 F.4th 1279, 1289 n.2 (D.C. Cir. 2025) (citation omitted). Regardless, the district court correctly reasoned that any *de minimis* exception is unhelpful to Vanda, since FDA recognizes that font may have important safety implications, while it rejected Vanda's safety arguments here based on braille. JA32.

As FDA recognized, "[a] difference in labeling related to braille was … inevitable for any generic tasimelteon product" since the proprietary name (Hetlioz®) "does not appear on the generic's container labeling at all" whereas the active ingredient name that "does appear in the container labeling for the generics (tasimelteon) does not appear in braille" on Vanda's label. JA922-923. To use Vanda's formulation, Teva was "obligated" to make at least *some* change involving braille because it is a different manufacturer than Vanda. Nothing in the statute dictated that Teva use braille in the way that Vanda prefers, which would minimize some formatting differences while introducing others. Instead, the statute allows different manufacturers to make their own choices about label formatting that do not change content.

## II. Teva's ANDA complies with the FDCA's conditions-of-use requirement.

Vanda's backup statutory challenge based on the conditions-of-use requirement also falls short. In view of FDA's decision that Teva could omit braille from its label, the agency directed Teva to leave out the associated instructions to pharmacies on Vanda's container label: "Do not cover Braille" and "Dispense in original container." As FDA noted, such statements were "irrelevant and unnecessary"—and "could be misleading"—for a generic product that "does not include braille in its container labeling." JA926.

Resisting FDA's commonsense approach, Vanda insists, Op. Br. 46-51, that Teva had to keep irrelevant and confusing pharmacy instructions on its label because the statute directs that "the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved" for the brand drug. 21 U.S.C. § 355(j)(2)(A)(i). Vanda is wrong twice over. The statements "Do not cover Braille" and "Dispense in original container" and are not "conditions of use." And regardless, the statute permits generic manufacturers to omit conditions of use included by the brand.

### A. The dispensing instructions Teva omitted at FDA's direction are not "conditions of use."

FDA's interpretation of "conditions of use" aligns with plain meaning. The term "use" means "to put into action or service" or "to expend or consume by putting to use," or to "consume or take (as liquor or drugs) regularly." *Use*, Webster's Third New Int'l Dictionary 2523-2524 (1986). A drug's "conditions of use" therefore refers to the circumstances under which the drug may be "put into action," "expend[ed]," or "consume[d]." In other words, the circumstances of utilization by the patient, not directions for how third parties like pharmacists should handle or dispense the drug.

This understanding of "conditions of use" fits with how the phrase is used in neighboring statutory provisions. An NDA applicant must show "the drug will have the effect it purports or is represented to have under the *conditions of use*

prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. § 355(d) (emphasis added). Likewise, as noted, *see supra* pp. 5-8, generic applicants must show that a "new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for *a condition of use* referred to in clause (i) [addressing labeling]." 21 U.S.C. § 355(j)(2)(A)(iv) (emphasis added). As used in these provisions, "conditions of use" refers to the treatment purpose of the drug—an NDA must show the drug is safe and effective under its conditions of use by the patient, and the generic applicant must show its product has the same therapeutic effect when directed to the same treatment and used by the patient in the same way.

Consistent with the plain meaning of the statute, FDA has explained that "conditions of use" "refer to how, to whom, and for which purposes a drug product is administered." JA926 (citing *ViroPharma, Inc. v. Hamburg*, 916 F. Supp. 2d 76, 80 (D.D.C. 2013)); *accord* 21 C.F.R. § 310.3(h)(5) (using "condition of use" to encompass the "method or duration of administration or application" of a drug); 21 C.F.R. § 314.53(b)(1) (providing instructions for listing method-of-use patents "that claim indications or other conditions of use for which approval is sought"). Courts have used the phrase in a similar manner. *See, e.g.*, *All. for Hippocratic Med.*, 602 U.S. at 376; *Ams. for Safe Access v. DEA*, 706 F.3d 438, 452 (D.C. Cir. 2013); *Bristol-Myers*, 91 F.3d at 1496.

As FDA explained, the statements "Do not cover Braille" and "Dispense in original container" are not "conditions of use" under the plain meaning. JA926. The statements "do not address how, to whom, or for what purpose Vanda's tasimelteon product is administered." *Id.* Rather, as the district court noted, the statements "give[] instructions to pharmacies for delivering the drug," and they are "grouped separately" from the language on the Hetlioz® label that addresses how the product is used by patients, such as the dosing instructions. JA35. Teva's omission of these two braille-related statements thus "did not change any of the conditions of use originally included in the Hetlioz label." *Id.*

Vanda objects that the two instructions should nonetheless qualify as conditions of use because they might impact whether the drug is ultimately put to its intended purpose. Op. Br. 47-50. Vanda's position appears to be that *all* instructions that appear on the labeling and fall within FDA's authority are "conditions of use." *Id.* at 48-49 (citing regulatory provisions addressing product warnings, handling, and storage). That view is implausibly broad. It is detached from the plain meaning of "use" and the statutory structure, which connects "conditions of use" to a drug's "therapeutic effect." *See supra* p. 46. [13]

[13] Vanda cites, Op. Br. 47, an unrelated section of the FDA's regulations addressing "Indirect Food Additives," and in particular "[c]omponents of paper and paperboard in contact with aqueous and fatty foods." 21 C.F.R. § 176.170. This section identifies substances that "may be used as components of the food-contact surface of paper and paperboard" and provides "conditions of use" for

Moreover, even if some dispensing instructions could theoretically qualify as conditions of use because they are "critical to correct use of a medication" (*e.g.*, proper storage to prevent degradation), Op. Br. 49-50, the two statements at issue do not fit that description. The statements do not address proper usage of tasimelteon in any way. On Vanda's own account, they are designed to ensure that a blind patient knows she is taking tasimelteon rather than some other drug. *Id.* at 49. (Of course, as discussed below, *see infra* pp. 51-54, FDA found that use of braille and these accompanying statements are *not* necessary for safe dispensing of tasimelteon.). Statements putatively intended to avoid inadvertent substitution are not "conditions of use" for the actual drug.

**B. Teva may omit conditions of use from the brand label.**

Even if the braille-related statements on the Hetlioz® container could be characterized as conditions of use for that product, the statute permits generic manufacturers to omit those conditions from their own labels.

The statute focuses on the "conditions of use … in the labeling proposed for the new drug"—*i.e.*, the generic product—and requires that the conditions of use "prescribed, recommended, or suggested" in the generic drug's labeling "have been previously approved" for the brand-name drug. 21 U.S.C. § 355(j)(2)(A)(i);

---

some of those substances. In that context, instructions relating to "[f]rozen or refrigerated storage," *id.*, describe how the substance may be "put into action or service." The analogy thus does not assist Vanda here.

*see also id.* § 355(j)(3)(B). As the district court recognized, although the statute "requires that all conditions of use included on the generic label be previously approved," it "does not necessarily require the converse: that all previously approved conditions of use be included on the generic label." JA36. To the contrary, this Court held in *Bristol-Myers* that "whether the label for the new generic lists every indication approved for use of the pioneer is a matter of indifference." 91 F.3d at 1500.

Vanda has no coherent way to distinguish *Bristol-Myers*. Vanda observes that the Court approved "the omission of certain *indications* from generic labels," Op. Br. 51, but indications are a subset of the "conditions of use" category. *See* JA926 ("'Conditions of use' includes a drug product's indications"); *see also* 21 C.F.R. § 314.127(a)(7) (addressing whether a generic label post carveout ensures the product is safe and effective "for all remaining, nonprotected *conditions of use*" (emphasis added)); *id.* § 314.53(b)(1) (referring to "indications or *other conditions of use*" (emphasis added)). In *Bristol-Myers*, the Court addressed whether generic manufacturers could omit indications under the statutory provision addressing "conditions of use." 91 F.3d at 1500. The Court never suggested that indications are somehow different for this purpose than other conditions of use—an argument with no textual basis. Rather, the Court recognized the statute bars generic manufacturers from *adding* conditions of use not present on the brand label but

does not speak to *omitting* conditions of use. *Id.*[14] Vanda's contention, Op. Br. 50, that there is no distinction between the two because "[r]emoving a restriction on use necessarily expands the possible conditions of use" is irreconcilable with the Court's holding.

## III. FDA's approval of Teva's ANDA was not arbitrary or capricious.

In addition to its statutory challenges, Vanda reprises its claim that FDA's approval decision was arbitrary and capricious. But as the district court held, JA37-39, Vanda cannot overcome the deferential standard of review.

### A. FDA did not change its position.

Vanda's contention that FDA "failed to acknowledge" a departure from prior policy "fails at the threshold step." Op. Br. 52-53. Vanda does not identify any change in agency position. To the contrary, as discussed, *see supra* pp. 34-37, FDA's approval decision here permitting Teva to make its own label formatting decisions aligns with agency practice.

The contrary argument urged by Vanda relies exclusively on statements made by the United States in its *Mensing* amicus brief. Op. Br. 54. But *Mensing* involved whether a generic manufacturer could unilaterally change *the content* of

---

[14] That does not mean an ANDA "could simply omit *any* condition of use." Op. Br. 50. An omission must be consistent with the same-labeling requirement (and its exceptions). And the resulting label must not make the generic drug "less safe or effective" than the brand. 21 C.F.R. § 314.127(a)(7).

its warnings post-approval. 564 U.S. at 611, 613-614; *see* FDA *Mensing* Amicus Br., 2011 WL 741927, at *16-17 (explaining that generic manufacturers may not unilaterally "add contraindications, warnings, precautions, adverse reactions, and other safety-related information" (citation omitted)). By contrast, "this case concerns only a change to a label's form, not its content." JA32-33. FDA's approval decision thus relied on the different-manufacturer exception, whereas FDA explained in *Mensing* that the exception was "not relevant" to the agency's position there. FDA *Mensing* Amicus Br., 2011 WL 741927, at *15-17.

Because this case and *Mensing* do not involve "factually and legally similar" issues, there was no change in position that FDA needed to recognize and explain. *Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1144 (D.C. Cir. 2014).

### B. FDA fully considered potential safety questions and concluded the use of braille was not necessary.

Vanda also provides no basis to second-guess FDA's judgment that Teva's roman-script label poses no safety risk—a judgment supported by the absence of any reported medication errors since the 2022 approval of generic tasimelteon products without braille. JA925. As the district court recognized, JA39, the record shows that FDA "reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Attacking this conclusion, Vanda asserts that FDA "did not address" the safety questions raised about braille during review of Teva's ANDA. Op. Br. 55-57. That is incorrect. The responsible FDA component, the Division of Labeling Review, considered responses from multiple offices—including the emails from individuals in the Office of New Drugs that Vanda highlights—and concluded that generic labels do not need braille. JA589; JA918 n.31. Moreover, the reviewer who raised tentative questions about omitting braille did so "without awareness that only a limited scope of information in braille was presented on [Vanda's] packaging and without any facts or data to support the speculation that 'it might be less safe to not have braille on the generics.'" JA950-951 (citation omitted).

Vanda appears to object that FDA did not do more to paper the record with its reasoning. But "agencies are entitled to a presumption of regularity." *FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 922 (2025). And "[a]s long as the agency's path may reasonably be discerned," this Court "will uphold the decision" even if its reasoning "was less than crystal clear." *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006) (citations omitted). FDA's decision clears those minimal hurdles.

In any event, no reasonable objection to the quality of FDA's decision-making could remain after FDA's rejection of Vanda's citizen petitions. In that process, the agency again canvassed numerous divisions, who unanimously agreed

that omission of braille from generic tasimelteon labels poses no safety risk. JA933-967. Even the former Deputy Director of the Division of Psychiatry—whose earlier email Vanda relies on so heavily—concluded there was no safety concern "upon review of the evidence before the Agency, including Vanda's prior statement that only 10% of the blind population reads braille." JA963. Vanda insinuates, Op. Br. 20, that FDA directed this senior official to "retract her prior views," but provides no support for that accusation.

Aside from relying on the disavowed email, Vanda faults FDA for not giving more weight to "safety information contained in Vanda's original application" featuring recommendations by the U.S. Access Board Working Group and European Union labeling guidelines. Op Br. 56, 58. Although Vanda tries to elevate the significance of these sources now, it mentioned them only in a single sentence of its NDA merely to justify its label's limited use of braille. JA637. Neither source concludes that including braille on a drug label is necessary for patient safety. The Working Group merely notes "[a] variety of delivery methods" for providing medication information to the visually impaired, including "audible, braille, and large print formats," JA901, and then identifies "best practices [to] promote access to prescription drug container label information" that are applicable to "all formats." JA902. Even less relevant are the European Commission's labeling guidelines, which explain how the industry can comply

with previously adopted directives from the European Commission. *See* JA652-653, 663-665. FDA was not required to give weight to these sources.

Finally, Vanda tries to prop up the single study it submitted to FDA in its petition, which consisted of a survey of 215 self-selected participants in Saudi Arabia. Op. Br. 58-59. Vanda accuses FDA of relying on "nitpicking distinctions," *id.* at 59, but it skips over the serious methodological flaws that FDA identified. The study's sample population was identified through advocacy organizations and social media influencers, raising questions about whether it is representative of the blind population in Saudia Arabia. JA925 n.75; JA966. Certainly, there is reason to doubt whether its conclusions generalize to the United States, where braille usage is much lower. *See id.* There is nothing "hairsplitting," much less "pretext[ual]," in FDA's conclusion that this study does not meaningfully inform whether omitting limited braille from a generic label in the United States would likely cause medication errors. Op. Br. 59. Nor is there any possible basis to question FDA's judgment based on other studies that Vanda admits are not part of the administrative record. *Id.* at 60.

### C. FDA has treated generic tasimelteon manufacturers consistently.

Vanda ends with the odd contention that FDA's approval of the "MSN Braille label directly contradicts its reasons for approving Teva's Braille-free label." Op. Br. 60-61. It does not. FDA concluded that braille "is not a

requirement for the generic products." JA589; *see* JA923, 927. FDA never suggested that generic manufacturers were *prohibited* from using braille. Just as Vanda "voluntarily proposed" to use braille for limited aspects of its labeling, JA923, generic manufacturers could do the same.

In trying to create tension, Vanda mischaracterizes FDA's reasoning. Vanda suggests, Op. Br. 61, that the MSN approval falsifies FDA's contention that it did not know how generics could comply with the same-labeling requirement given Vanda's use of braille to depict the brand name. But FDA merely rejected *Vanda's* "proposed interpretation" as incoherent since Vanda insisted on identical braille usage between brand and generic products, but "[a] difference in labeling related to braille was … inevitable." JA922-923. MSN's use of "Braille lettering for the generic name," Op. Br. 61, *confirms* FDA's point, since Vanda's label uses only roman script for tasimelteon. *See supra* p. 15.

**IV. Under no circumstances is Vanda entitled to a vacatur remedy.**

Vanda asks this Court to "reverse the judgment below and remand for entry of judgment in favor of Vanda." Op. Br. 62. Vanda does not address the remedy, but below it argued for vacatur of Teva's approval. *E.g.*, JA491-495. Teva and FDA opposed vacatur, and argued supplemental briefing would be appropriate if the district court reached the issue. *E.g.*, JA523; JA557. That proved unnecessary when the district court upheld FDA's decision. This Court should likewise have

no reason to address remedy because it should affirm. But if the Court reverses for any reason, it should let the district court address remedy in the first instance on remand.

In deciding whether to vacate a challenged agency decision, courts consider (1) "the seriousness of the order's deficiencies" and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-151 (D.C. Cir. 1993) (citation omitted). Here, both factors push strongly against vacating Teva's approval. First, any error in Teva's labeling could easily be corrected since FDA regulations facilitate labeling changes without requiring applicants to restart the approval process. *See* 21 C.F.R. § 314.70(c)(6)(iii)(C), (d)(2)(x); 21 C.F.R. § 314.97. Second, vacatur of Teva's ANDA—three or more years after it began marketing its product—would be disruptive. Teva's evidence below demonstrated that vacating its approval could disrupt patient access to tasimelteon and significantly raise costs for patients and healthcare payors, including the federal government. JA390-391.

District courts have discretion over the remedy in an APA action. *See Am. Great Lakes Ports Ass'n v. Shultz*, 962 F.3d 510, 518 (D.C. Cir. 2020) (remand without vacatur remedy is reviewed only for "an abuse of discretion"). Given the significant arguments against vacatur, if remedy becomes relevant in this appeal, the Court should leave the issue for remand.

## CONCLUSION

The Court should affirm the district court's judgment.

Dated: November 18, 2025

Respectfully submitted,

/s/ *Brian T. Burgess*
Brian T. Burgess
Isabel M. Marin
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
*bburgess@goodwinlaw.com*
*imarin@goodwinlaw.com*

*Counsel for Teva Pharmaceuticals USA, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,842 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), as it has been prepared in a proportionally spaced typeface, 14-point Times New Roman font, using Microsoft Word.

Dated: November 18, 2025

/s/ *Brian T. Burgess*
Brian T. Burgess

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2025, I electronically filed the foregoing brief with the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.

/s/ *Brian T. Burgess*
Brian T. Burgess