**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5041**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

VANDA PHARMACEUTICALS, INC.,
Plaintiff-Appellant,

v.

UNITED STATES FOOD AND DRUG ADMINISTRATION, et al.,
Defendants-Appellees,

and

TEVA PHARMACEUTICALS, USA, INC.,
Intervenor-Defendant-Appellee.

---

On Appeal from the United States District Court
for the District of Columbia

---

# BRIEF FOR DEFENDANTS-APPELLEES

---

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
DAVID L. PETERS
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*202-598-6735*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Plaintiff-appellant is Vanda Pharmaceuticals, Inc. The defendants-appellees are the U.S. Food and Drug Administration; the U.S. Department of Health and Human Services; Martin Makary, in his official capacity as Commissioner of Food and Drugs; and Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services. Intervenor-appellee is Teva Pharmaceuticals, USA, Inc. There were no amici in district court.

### B. Rulings Under Review

Plaintiff appeals from the memorandum opinion and order issued on February 13, 2025, by the Honorable Tanya S. Chutkan, JA12, JA41 [Dkt. Nos. 61 & 62], Case No. 1:23-cv-00280 (D.D.C.). The memorandum opinion is reported at 766 F. Supp. 3d 85.

### C. Related Cases

This case has not previously been before this Court or any court other than the district court. Counsel for the government are unaware

of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ David L. Peters*
David L. Peters

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 3

STATEMENT OF THE ISSUES .......... 3

PERTINENT STATUTES AND REGULATIONS .......... 4

STATEMENT OF THE CASE .......... 4

A. Statutory & Regulatory Background .......... 4

1. New Drug Applications .......... 4

2. Abbreviated New Drug Applications .......... 6

B. Factual Background & Prior Proceedings .......... 8

1. FDA approves a new drug application for Hetlioz. .......... 8

2. FDA approves Teva's generic version of Hetlioz. .......... 9

3. Vanda challenges the approval of Teva's generic before the agency .......... 11

4. Vanda files this action challenging the approval of Teva's generic. .......... 14

SUMMARY OF ARGUMENT .......... 19

STANDARD OF REVIEW .......... 28

ARGUMENT .......... 28

I. FDA Correctly Applied The Same-Labeling Requirement .......... 28

A. The Act Allows Labeling Changes That Reflect Optional Choices By Generic Manufacturers. ..... 28

B. The Different-Manufacturer Exception Allowed Changes To The Voluntary Labeling Features At Issue Here. ..... 38

C. Vanda's Narrow Construction Of The Different-Manufacturer Exception Is Unworkable. ..... 43

II. FDA Correctly Applied The Conditions-Of-Use Requirement. ..... 52

III. FDA's Decisions Were Reasonable ..... 58

A. FDA Did Not Change Its Position On The Different-Manufacturer Exception. ..... 58

B. FDA Reasonably Addressed All Safety Concerns. ..... 60

C. FDA Did Not Treat Similarly Situated Generic Applications Differently. ..... 64

CONCLUSION ..... 66

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Baltimore Gas & Elec. Co. v. National Res. Def. Council, Inc.*,
462 U.S. 87 (1983) ........................................................ 19, 61

*Bristol-Myers Squibb Co. v. Shalala*,
91 F.3d 1493 (D.C. Cir. 1996) ............................... 26, 35, 36, 40, 55, 56

*Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*,
566 U.S. 399 (2012) ........................................................ 6, 28, 30

*City of Waukesha v. EPA*,
320 F.3d 228 (D.C. Cir. 2003) ........................................................ 64

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................................ 59

*Grayscale Invs., LLC v. SEC*,
82 F.4th 1239 (D.C. Cir. 2023) ........................................................ 65

*Hill Dermaceuticals, Inc. v. FDA*:
2012 WL 5914516 (D.D.C. May 18, 2012),
*aff'd per curiam*, 709 F.3d 44 (D.C. Cir. 2013) .. 12, 36, 37, 39, 43, 50
709 F.3d 44 (D.C. Cir. 2013) ........................................................ 36, 37

*Horn & Hardart Co. v. National R.R. Passenger Corp.*,
1985 WL 9426 (D.D.C. May 30, 1985) ........................................ 46-47

*Kennedy v. Braidwood Mgmt., Inc.*,
145 S. Ct. 2427 (2025) ........................................................ 52

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................................ 52, 53

*National Ass'n of Clean Air Agencies v. EPA*,
489 F.3d 1221 (D.C. Cir. 2007) ................................................ 61, 65

*PLIVA, Inc. v. Mensing*,
564 U.S. 604 (2011) ........................................ 6, 26, 31, 38, 51, 59

*Ponce v. Billington*,
679 F.3d 840 (D.C. Cir. 2012) .......... 45

*Railway Lab. Execs.' Ass'n v. U.S. R.R. Ret. Bd.*,
749 F.2d 856 (D.C. Cir. 1984) .......... 46, 47

*Safari Club Int'l v. Zinke*,
878 F.3d 316 (D.C. Cir. 2017) .......... 28

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) .......... 52

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
505 U.S. 763 (1992) .......... 50

*University of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) .......... 45

*ViroPharma, Inc. v. Hamburg*,
916 F. Supp. 2d 76 (D.D.C. 2013) .......... 8, 53

*Wal-Mart Stores, Inc. v. Samara Bros.*,
529 U.S. 205 (2000) .......... 50

*Wyeth v. Levine*,
555 U.S. 555 (2009) .......... 5, 29

*Zeneca, Inc. v. Shalala*,
213 F.3d 161 (4th Cir. 2000) .......... 12, 17, 22, 34, 35, 48, 49

**Statutes:**

Federal Food, Drug, and Cosmetic Act (FDCA):
21 U.S.C. § 301 *et seq.* .......... 4
21 U.S.C. § 321(m) .......... 4, 39
21 U.S.C. § 352 .......... 5
21 U.S.C. § 353 .......... 5
21 U.S.C. § 355(a) .......... 4
21 U.S.C. § 355(b) .......... 4
21 U.S.C. § 355(b)(1)(A)(i) .......... 4, 28-29
21 U.S.C. § 355(b)(1)(A)(iv) .......... 31

21 U.S.C. § 355(b)(1)(A)(vi) .......... 4, 29
21 U.S.C. § 355(d) .......... 4, 5, 29
21 U.S.C. § 355(j) .......... 20
21 U.S.C. § 355(j)(2)(A)(i) .......... 3, 7, 25, 53, 55
21 U.S.C. § 355(j)(2)(A)(ii) .......... 6, 21, 30, 31
21 U.S.C. § 355(j)(2)(A)(iii) .......... 6, 30
21 U.S.C. § 355(j)(2)(A)(v) .......... 3, 7, 21, 22, 30, 31, 33, 45
21 U.S.C. § 355(j)(2)(A)(vi) .......... 31
21 U.S.C. § 355(j)(2)(A)(vii)(III)-(IV) .......... 36, 50
21 U.S.C. § 355(j)(4)(B) .......... 7, 53
21 U.S.C. § 355(j)(4)(G) .......... 7
21 U.S.C. § 355(j)(4)(H) .......... 31

28 U.S.C. § 1291 .......... 3

28 U.S.C. § 1331 .......... 3

**Regulations:**

21 C.F.R. § 201.10 .......... 5

21 C.F.R. § 201.50 .......... 5, 29

21 C.F.R. § 201.56 .......... 5

21 C.F.R. § 201.57 .......... 5, 29

21 C.F.R. § 201.57(c) .......... 4

21 C.F.R. § 201.80 .......... 5

21 C.F.R. § 201.100 .......... 5

21 C.F.R. § 201.100(b) .......... 5, 29

21 C.F.R. § 310.3(h)(5) .......... 8

21 C.F.R. § 314.53(b) .......... 8

21 C.F.R. § 314.94(a)(8)(iv) .......... 7, 34, 48

**Rule:**

Fed. R. App. P. 4(a)(1)(B) .................................................................... 3

**Other Authorities:**

*Abbreviated New Drug Application Regulations*,
57 Fed. Reg. 17,950 (Apr. 28, 1992) ............................................ 32, 33

*Condition*, Webster's Third New International
Dictionary (1986) .......................................................................... 57

*Require*, Webster's Third New International
Dictionary (1986) ............................................................ 18, 24, 46, 48

*Use*, Webster's Third New International Dictionary
(1986)............................................................................................... 57

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| FDA | Food and Drug Administration |
| FDCA | Federal Food, Drug, and Cosmetic Act |
| Teva | Teva Pharmaceuticals, USA, Inc. |
| Vanda | Vanda Pharmaceuticals, Inc. |

## INTRODUCTION

To facilitate the introduction of low-cost generic drugs to market, Congress amended the Federal Food, Drug, and Cosmetic Act to provide an abbreviated pathway for the approval of generic versions of brand-name drugs. Generic manufacturers may obtain approval under this abbreviated pathway by showing that their drugs are the same in certain respects as their brand-name counterparts. This ensures that generic drugs are as safe and effective as brand-name drugs. But where safety and effectiveness are not materially affected, the statutory scheme allows generic drugs to differ from their brand-name counterparts in certain respects, such as by allowing in many cases for generic manufacturers to formulate their dugs with different inactive ingredients.

The same is true of a generic drug's labeling. Generally, a generic manufacturer must show that its labeling is the same as that of its brand-name counterpart. As with the formulation of a drug, however, that does not mean that the labeling of the generic and the brand-name drug must be entirely identical. It is common ground that certain types of labeling changes are permitted, provided that they do not jeopardize

the safety or effectiveness of the generic drug. The Food and Drug Administration (FDA) has long understood the statutory scheme to allow labeling changes that reflect the optional choices generic manufacturers are permitted to make about their products—*e.g.*, changes to the inactive ingredients included in a drug's formulation. As relevant here, FDA also permits generic manufacturers to omit or alter voluntarily adopted labeling features that do not convey information necessary to the drug's safe and effective use.

FDA accordingly approved the generic application at issue here—an application by Teva Pharmaceuticals, USA, Inc. (Teva) for a generic version of a brand-name drug manufactured by Vanda Pharmaceuticals, Inc. (Vanda). Vanda voluntarily repeated on its brand-name label certain information in braille. Because FDA determined that the repetition of this information in braille was a voluntary element that was unnecessary for the drug's safe and effective use, it permitted Teva to omit the braille from its generic label. As the district court recognized, that determination was consistent with the statute, in accord with precedent, and eminently reasonable. The district court's judgment should be affirmed.

## STATEMENT OF JURISDICTION

Vanda invoked the district court's subject-matter jurisdiction under 28 U.S.C. § 1331. JA45 [Dkt. 1, at 4]. On February 13, 2025, the district court entered a final judgment denying Vanda's summary-judgment motion and granting the cross-motions for summary judgment filed by FDA and Teva. JA42 [Dkt. 62, at 1]. Vanda filed a timely notice of appeal on February 24, 2025. JA560 [Dkt. 63, at 1]; *see* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

FDA approved Teva's generic application and denied Vanda's citizen petition challenging that approval. The questions presented are:

**1.** Whether FDA correctly concluded that the statutory exception to the "same labeling" requirement for a generic drug applied here. 21 U.S.C. § 355(j)(2)(A)(v).

**2.** Whether FDA correctly concluded that the conditions of use listed on the generic drug's label had been previously approved for the brand-name drug. 21 U.S.C. § 355(j)(2)(A)(i).

**3.** Whether FDA's decisions were arbitrary and capricious.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Statutory & Regulatory Background

#### 1. New Drug Applications.

Under the Federal Food, Drug, and Cosmetic Act (the FDCA or Act), 21 U.S.C. § 301 *et seq.*, and subject to certain exceptions not implicated here, new drugs may not be sold in the United States without FDA approval. *Id.* § 355(a). To obtain FDA approval, a manufacturer generally must submit a new drug application. *Id.* § 355(b). Among other things, that application must contain proposed labeling for the drug, along with sufficient data to show that the drug is safe and effective under the conditions proposed in the labeling. *Id.* § 355(b)(1)(A)(i), (vi), (d); *see generally* 21 C.F.R. § 201.57(c). The Act defines a drug's labeling broadly to include "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).

The Act and its implementing regulations also set out various labeling requirements applicable to drugs approved under a new drug

application. *See, e.g.*, 21 U.S.C. §§ 352, 353; 21 C.F.R. §§ 201.10, 201.50, 201.56, 201.57, 201.80, 201.100. For prescription drugs, FDA's implementing regulations impose certain requirements regarding information that must appear specifically on the drug's label, *see, e.g.*, 21 C.F.R. §§ 201.50, 201.100(b), as well as requirements on the content and format of the prescribing information that accompanies the drug, *see, e.g.*, *id.* § 201.57.

The brand-name manufacturer is ultimately responsible for "crafting an adequate label" within these bounds. *Wyeth v. Levine*, 555 U.S. 555, 571 (2009). Manufacturers choose what to propose in the labeling they submit to FDA in the first instance and have some latitude in doing so. FDA evaluates the submission in the context of the choices proposed by the manufacturer and the limitations imposed by statute and regulations. *See* 21 U.S.C. § 355(d) (setting out the "[g]rounds for refusing" a new drug application, including that the drug is unsafe or ineffective "under the conditions of use prescribed, recommended, or suggested in the proposed labeling").

### 2. Abbreviated New Drug Applications.

In 1984, Congress amended the Act to increase competition among drug manufacturers and to reduce the expense of approved drugs. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 612 (2011). The so-called Hatch-Waxman Amendments provide an abbreviated pathway for the approval of generic versions of approved brand-name drugs. Under the amendments, a would-be generic manufacturer may file an abbreviated new drug application that "piggy-back[s]" in key respects on an approved new drug application. *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405 (2012). Instead of providing independent evidence of safety and effectiveness, for instance, the typical abbreviated new drug application must demonstrate that the generic drug "has the same active ingredients as, and is biologically equivalent to, the brand-name drug." *Id.*; 21 U.S.C. § 355(j)(2)(A)(ii), (iv). The generic manufacturer also must show, among other things, that "the route of administration, the dosage form, and the strength" of the generic drug "are the same as those of the" brand-name drug. 21 U.S.C. § 355(j)(2)(A)(iii).

As relevant here, the Hatch-Waxman Amendments impose certain requirements on a generic drug's labeling. In most cases, a generic manufacturer must show that "the labeling proposed for the new drug is the same as the labeling approved for the" brand-name drug. 21 U.S.C. § 355(j)(2)(A)(v); *see also id.* § 355(j)(4)(G). The requirement is subject to exceptions, however, including one "for changes required … because the new drug and the listed drug are produced or distributed by different manufacturers." *Id.* § 355(j)(2)(A)(v). FDA has long understood the different-manufacturer exception to "include differences in expiration date, formulation, bioavailability, or pharmacokinetics" as well as "labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under" the Act. 21 C.F.R. § 314.94(a)(8)(iv).

A generic manufacturer also must "show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for" the brand-name drug. 21 U.S.C. § 355(j)(2)(A)(i); *see also id.* § 355(j)(4)(B). FDA understands "conditions of use" to encompass such things as "how, to whom, and for

what purpose the drug is administered." *ViroPharma, Inc. v. Hamburg*, 916 F. Supp. 2d 76, 80 (D.D.C. 2013) (quotation marks omitted); *see, e.g.*, 21 C.F.R. § 310.3(h)(5) (recognizing that a drug's "method or duration of administration or application" is a condition of use); *id.* § 314.53(b) (specifying that indications are conditions of use).

### B. Factual Background & Prior Proceedings

#### 1. FDA approves a new drug application for Hetlioz.

In 2014, FDA approved Vanda's new drug application to market the drug tasimelteon under the brand name Hetlioz. JA16 [Dkt. 61, at 5]. Hetlioz treats Non-24-Hour Sleep-Wake Disorder, a disorder in which the body cannot synchronize its internal circadian rhythm, often leading to symptoms including sleep deprivation, insomnia, and excessive daytime sleepiness. JA15-16 [Dkt. 61, at 4-5]. The disorder frequently affects people who are visually impaired. JA16 [Dkt. 61, at 5].

As part of the approval process, Vanda submitted proposed labeling for Hetlioz. Vanda included the drug's brand name, nonproprietary name, and product strength in Roman script on the container label, along with other information. JA16 [Dkt. 61, at 5].

Vanda also proposed as "a voluntary step" to repeat the brand name and the strength in braille on the container label. JA728 [AR000477]. In considering the proposal, FDA directed Vanda to conduct a labeling comprehension study to assess the risk that the inclusion of braille could cause medication errors. JA16 [Dkt. 61, at 5]. Given Vanda's proposal to include braille, FDA also recommended Vanda include on the label in bold Roman script the statements: "Dispense in original container. Do not cover Braille." JA16 [Dkt. 61, at 5] (quotation marks omitted); *see also* JA796 [AR000697]. With that language, and after finding the results of the comprehension study "acceptable"—*i.e.*, that the inclusion of braille did not unacceptably increase the risk of medication errors—FDA approved Hetlioz with its labeling. *See* JA691 [AR000286]; JA842 [AR000750].

**2. FDA approves Teva's generic version of Hetlioz.**

In 2018, Teva submitted an abbreviated new drug application seeking approval to market a generic version of Hetlioz. Teva's application included proposed labeling that differed from Hetlioz's labeling in certain respects. Teva proposed not to include braille on its container label and to change the label's "font, arrangement, and

design." JA17 [Dkt. 61, at 6]; *see* JA93 [Dkt. 44-1, at 11] (Hetlioz label); JA102 [Dkt. 44-1, at 20] (Teva label).

The agency consulted with several of its components about Teva's proposal to omit braille from its container label. Although some components initially expressed reservations, JA590 [AR000020], FDA ultimately concluded that the "inclusion of braille language is not a requirement for the generic product[]" because the "inclusion of braille language was not [a] condition of approval for" Hetlioz. JA589 [AR000019]. Rather, "braille was proposed by [Vanda] as 'nice to have' information" and deemed "acceptable" by the agency. JA589 [AR000019]. Because FDA determined that the inclusion of braille was unnecessary, it also directed Teva to omit the corresponding statements: "Dispense in original container. Do not cover Braille." JA17 [Dkt. 61, at 6]. The agency explained that the statements were "not necessary" as they served no independent "quality/stability" purpose. JA580 [AR000010]. FDA thus approved the application, and Teva began marketing generic tasimelteon in late 2022. JA18 [Dkt. 61, at 7].

### 3. Vanda challenges the approval of Teva's generic before the agency.

Shortly after FDA approved Teva's abbreviated new drug application, Vanda filed a citizen petition challenging the agency's action. As relevant here, Vanda argued that the omission of braille and the corresponding braille-related statements from Teva's labeling violated the Act's same-labeling and conditions-of-use requirements. JA725-26 [AR000474-75]. Vanda requested that FDA revoke the application's approval and order a recall of Teva's product. JA725 [AR000474].

FDA denied Vanda's petition. First, the agency concluded that the labeling differences did not violate the same-labeling requirement. FDA explained that "[a] generic drug's labeling is not required to be identical to the labeling of the listed drug it references" and may have "labeling that differs … in certain circumstances," including pursuant to the exception for "difference[s] due to different manufacturer[s]." JA920-21 [AR000884-85] (quotation marks omitted). FDA explained that both courts and the agency have recognized "the validity of [such] permitted differences" across a range of scenarios. JA921 [AR000885]. For example, FDA "approved a generic drug with labeling that included

an ingredient safety warning that was not in the brand labeling, where the generic manufacturer chose to formulate its product with a different inactive ingredient than that in the" brand-name drug. JA921 [AR000885] (citing *Zeneca, Inc. v. Shalala,* 213 F.3d 161 (4th Cir. 2000)). FDA also approved generic drugs with labeling that did not include statements "about peanut protein testing" or "disposal methods" that were included in the brand-name labeling. JA921 [AR000885] (citing *Hill Dermaceuticals, Inc. v. FDA*, 2012 WL 5914516, at *17 (D.D.C. May18, 2012), *aff'd per curiam*, 709 F.3d 44 (D.C. Cir. 2013)). And FDA approved a "generic product that did not include halal and kosher certifications in their labeling, where the [brand-name drug] did." JA921 [AR000885].

FDA concluded that the changes to Teva's container label were also "permissible difference[s] due to difference in manufacturer." JA931 [AR000895]. FDA pointed out that the only information that Vanda included in braille was the drug's brand name and strength. FDA explained that Vanda "voluntarily" included braille on its label and that "FDA did not consider braille necessary for the safe and effective use of Hetlioz." JA923 & n.60 [AR000887]. Indeed,

"[i]nformation essential to the safe use of the drug, such as dosing instructions and warnings, is not presented in braille in the container labeling for Hetlioz." JA924 [AR000888]. FDA thus concluded that it was acceptable under the different-manufacturer exception for Teva to omit the repetition of information in braille that Vanda included on its labeling "voluntarily" and that was not "necessary for the safe and effective use of the drug." JA923 [AR000887].

For much the same reason, FDA concluded that the "omission of the associated statements, 'Dispense in original container' and 'Do not cover Braille' also do not violate the same labeling requirement." JA926 [AR000890]. FDA explained that it "recommended Vanda include these statements because Hetlioz included certain information in braille" but that "such statements are irrelevant and unnecessary if a generic tasimelteon … product does not include braille in its container labeling." JA926 [AR000890]. In fact, FDA concluded that the statements "could be misleading … if the labeling did not bear any braille." JA926 [AR000890].

FDA likewise concluded that the omission of the braille-related statements did not violate the conditions-of-use requirement. JA926

[AR000890]. The agency explained that it understands conditions of use to refer to such circumstances as "how, to whom, and for which purposes a drug product is administered." JA926 [AR000890]. Conditions of use thus include a "drug product's indications and dosing regimen," but do not encompass "all contents of the drug product's labeling." JA926 [AR000890]. Applying that principle here, FDA concluded that the omission of the braille-related statements did not alter the conditions of use because they did not "alter Hetlioz's indications or modify the dosing regimen" and thus did "not address how, to whom, or for what purpose Vanda's tasimelteon product is administered." JA926 [AR000890].

#### 4. Vanda files this action challenging the approval of Teva's generic.

While its citizen petition was still pending before the agency, Vanda filed this action challenging FDA's approval of Teva's generic application, and Teva intervened to defend its product's approval. Vanda initially sought a preliminary injunction suspending FDA's approval. The district court denied that request because Vanda failed to establish that it faced irreparable harm or that the equities weighed

in favor of preliminary relief. *See* JA19 [Dkt. 61, at 8]. Vanda did not appeal that decision.

After FDA denied Vanda's citizen petition, Vanda filed an amended complaint, asserting that FDA's approval of Teva's generic application and the corresponding denial of Vanda's citizen petition violated the Administrative Procedure Act (APA) in several respects. Specifically, Vanda asserted that (1) FDA's approval contravened the Act's same-labeling requirement, (2) FDA's approval contravened the Act's conditions-of-use requirement, and (3) FDA acted arbitrarily in denying Vanda's petition. JA127-28 [Dkt. 44-1, at 45-47]. Vanda sought an order vacating the approval of Teva's generic application and compelling FDA to recall Teva's products. After the parties filed cross-motions for summary judgment, the district court denied Vanda's motion in full and granted the cross-motions filed by FDA and Teva.

First, the district court held that FDA's approval of Teva's generic application did not violate the Act's same-labeling requirement. The court explained that "there is consensus" that the different-manufacturer exception "permits at least some changes to the label that reflect optional choices by the generic manufacturer," such as omitting

kosher or halal certifications, adjusting label colors or font, and making labeling changes that reflect "allowable product differences." JA24-25 [Dkt. 61, at 13-14]. Looking to the Act's "text, structure, history, and purpose" as well as "relevant agency and judicial precedent," the court concluded that Teva's decision to omit braille and the corresponding braille-related statements likewise fell within that exception. JA34 [Dkt. 61, at 23].

The district court explained that the Act requires FDA to ensure generic labeling "is fully compliant with FDCA requirements, including that the generic drug remains safe and effective as labeled, and that its label is not inaccurate or misleading." JA34 [Dkt. 61, at 23] (quotation marks omitted). But nothing in the Act, the court explained, "prohibits changes to voluntarily adopted forms of presenting information on the brand-name label where the generic one conveys the same information and the FDA has determined that the change will not diminish the drug's safety or efficacy." JA34 [Dkt. 61, at 23]. The court explained that this case "involves such a change." JA34 [Dkt. 61, at 23]. As the court pointed out, "the information conveyed by th[e] braille lettering … was also printed in Roman script on the label," and Vanda's "decision to

include braille lettering … was itself voluntary." JA25 [Dkt. 61, at 14]. Moreover, FDA determined that Teva's label need not include braille "for the safe and effective use of the product." JA32 [Dkt. 61, at 21 (quoting AR000887)]. The court concluded that such "safe changes to voluntary label features," JA26 [Dkt. 61, at 15], "d[o] not violate the same-label requirement or its different-manufacturer exception," JA34 [Dkt. 61, at 23].

The court rejected Vanda's narrow reading of the different-manufacturer exception as mandating that "if a generic manufacturer can match the brand-name label, it must do so." JA30 [Dkt. 61, at 19]. The court explained that Vanda's "unworkable" interpretation would preclude labeling changes—such as those reflecting allowable product differences—that all agree are permissible. JA30 [Dkt. 61, at 19] (citing *Zeneca*, 213 F.3d at 169). As the court pointed out, labeling differences reflecting such changes are "not compel[led]" because generic manufacturers could match the brand-name competitor's manufacturing process or drug formulation. JA31 [Dkt. 61, at 20]. The court thus explained that when read "in context," JA33 [Dkt. 61, at 22], the statutory exception is best understood to permit changes like those

at issue here that are "suitable or appropriate in a particular case." JA23 [Dkt. 61, at 12] (quoting *Require*, Webster's Third New International Dictionary 1929 (1986)).

As to Vanda's remaining claims, the court held that Teva's omission of the braille-related statements did not violate the Act's requirement that the generic drug's conditions of use be previously approved for the brand-name drug. The court explained that under the "plain meaning of the text," the term "'conditions of use' denotes the circumstances that are essential to the consumption or taking of the drug"—that is, "'how, to whom, and for what purpose the drug is administered.'" JA35 [Dkt. 61, at 24 (quoting AR000890)]. The court concluded that the omission of the printed statements did not alter the conditions of use because they "give[] instructions to pharmacies for delivering the drug," not "direction[s] for the drug's actual 'use.'" JA35 [Dkt. 61, at 24].

The court further held that FDA acted reasonably in granting Teva's generic application and denying Vanda's citizen petition. The court concluded that the agency reasonably determined that "Teva's label would be safe and effective" without braille, which is a "'scientific

determination'" for which the "court's review is 'at its most deferential.'" JA39 [Dkt. 61, at 28] (quoting *Baltimore Gas & Elec. Co. v. National Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)). The court rejected Vanda's assertions that the agency ignored relevant safety evidence, explaining that "the administrative record shows that … FDA expressly considered … internal analysis suggesting that there were no safety concerns" as well as other evidence "before making its decision." JA38 [Dkt. 61, at 27]. The court thus entered a final judgment dismissing the case. This timely appeal followed.

## SUMMARY OF ARGUMENT

This Court should affirm the dismissal of Vanda's claims. FDA correctly applied both the same-labeling requirement and the conditions-of-use requirement in granting Teva's generic application and dismissing Vanda's citizen petition. FDA's decisions were also reasonable and reasonably explained.

**I.** FDA correctly applied the same-labeling requirement in approving Teva's proposal to omit braille from its generic label.

**A.** In the Hatch-Waxman Amendments, Congress provided an abbreviated pathway for the approval of generic drugs in order to

increase competition and to reduce drug prices. A brand-name drug manufacturer must submit an application that includes, among other things, data showing that the drug is safe and effective if used under the conditions proposed in the labeling. The labeling of prescription drugs also must include certain safety information and meet certain formatting requirements. Such information is necessary to obtain FDA approval of a drug and its proposed labeling, but at least in some circumstances, the agency may also approve a drug with proposed labeling where the manufacturer voluntarily includes additional information or repeats required information in a different format.

The requirements for generic drugs are different. A generic manufacturer may submit an abbreviated application showing that its drug is the "same" in certain respects as the brand-name drug. *See* 21 U.S.C. § 355(j). These requirements allow generic manufacturers to rely on the previous finding of safety and effectiveness for the brand-name drug and thus ensure that generic drugs are as safe and effective as brand-name drugs. But generic drugs may differ from their brand-name counterparts in certain respects where those differences do not materially affect the drug's safety and efficacy. For example, although

a generic drug must contain the same active ingredient as the brand-name drug, it may contain different inactive ingredients. *Id.* § 355(j)(2)(A)(ii).

A similar dynamic applies to a generic drug's labeling. Generally, a generic drug's labeling must be the "same" as the brand-name drug's labeling. 21 U.S.C. § 355(j)(2)(A)(v). That requirement allows the generic manufacturer to avoid the costly and time-consuming process of demonstrating that a new set of dosing requirements, indications, and other labeling information render the drug safe and effective if used as intended. But as noted, not all aspects of the generic drug's labeling must be the same as that of the brand-name drug. Generic labels obviously must be changed to reflect permissible product differences, such as differences in inactive ingredients. And generic drugs are not compelled (and in some cases, not permitted) to mimic other aspects of the brand-name labeling, such as trade dress and design choices. Congress authorized these sorts of differences through an exception that allows labeling changes that are "required … because" the generic and brand-name drugs are "produced or distributed by different manufacturers." *Id.*

The exception has long been understood to allow labeling differences that reflect the optional choices generic manufacturers are permitted to make about their products, so long as such differences do not jeopardize the safety and effectiveness of the generic version. Thus, courts and FDA alike have recognized that the exception allows labeling changes that reflect permissible differences in a generic drug's formulation, such as the use of a different inactive ingredient. *See, e.g.*, *Zeneca, Inc. v. Shalala*, 213 F.3d 161 (4th Cir. 2000). Even when generic manufacturers could formulate (and label) their products in the same manner as their brand-name counterparts, it makes no sense to read the same-labeling requirement to prohibit optional changes that the Act elsewhere allows.

**B.** FDA properly applied the different-manufacturer exception in allowing the labeling changes at issue here. Many aspects of a drug's labeling are necessary to ensure that the drug can be used safely and effectively. But to the extent that the brand-name manufacturer made voluntary labeling choices that were unnecessary for the drug's safety and effectiveness, the statutory scheme permits generic manufacturers to deviate from those voluntary choices. That

is most obvious in the case of purely cosmetic changes like the color or font of the container label or package insert. But the same principle applies to other optional labeling features as well.

The different-manufacturer exception allowed the labeling changes at issue here because they involved the omission of voluntary label features that did not diminish the drug's safety and effectiveness. There is no dispute that Vanda included braille on Hetlioz's label voluntarily. Braille was not a condition of Hetlioz's approval and was not necessary to its safe and effective use. FDA further concluded that the omission of braille on Teva's generic label would not render the generic version less safe or effective than the brand-name drug. In fact, FDA found no indication that the omission led to patient confusion or medication errors.

**C.** Vanda's arguments to the contrary are unpersuasive, as Vanda offers no coherent understanding of the statutory scheme. Vanda principally argues that the statutory term "required" means that the exception must be construed narrowly to permit only changes that are "'needed' or 'obligatory,'" Vanda Br. 22, but even Vanda cannot accept the consequences of its argument.

Vanda properly recognizes that generic manufacturers have latitude to alter some aspects of their labeling, from cosmetic changes to design choices to more substantive changes that identify differences in inactive ingredients or reflect corresponding safety warnings. Such changes are not the inevitable consequence of manufacturing by a different manufacturer; a generic manufacturer could choose, for example, to use the same inactive ingredients and to label its packaging with the same colors and fonts as the brand-name manufacturer. But even Vanda does not contend that generic manufacturers are stripped of their ability to make such optional choices about the manufacturing and marketing of their drugs. A more coherent reading of the statutory text—and the one that FDA applied here—encompasses those labeling changes that are "suitable or appropriate in a particular case" because the generic and brand-name drugs are manufactured by different entities. *Require*, Webster's Third New International Dictionary 1929 (1986).

**II.** FDA also correctly applied the conditions-of-use requirement in approving Teva's proposed label. To market a generic drug, a manufacturer must "show that the conditions of use" on the drug's

labeling "have been previously approved for" the brand-name drug. 21 U.S.C. § 355(j)(2)(A)(i). The requirement's purpose is to ensure that generic drugs are approved to be used under circumstances already approved for the brand-name drug—for example, to treat a previously approved population for a previously approved indication. The approval of Teva's generic application satisfied that requirement because the proposed labeling makes clear that, among other things, the generic version of tasimelteon treats the same population for the same indication using the same instructions as the brand-name version.

Vanda errs in arguing that Teva's label violated the conditions-of-use requirement by omitting the statements "Dispense in original container" and "Do not cover the Braille." The statute's focus is on whether the generic drug is approved for any new conditions of use, not on whether the generic drug's labeling replicates in full the language on the brand-name drug's label. That reading is confirmed by this Court's decision in *Bristol-Myers Squibb Co. v. Shalala*, which recognized that the conditions-of-use requirement does not preclude labeling changes that omit previously approved conditions of use from a generic drug's labeling. 91 F.3d 1493, 1500 (D.C. Cir. 1996).

Vanda only underscores its error in arguing that the labeling changes "necessarily" created a new condition of use. Vanda Br. 47. The argument cannot be squared with the plain language of the statute, which cannot plausibly be construed to treat every change to a labeling feature as creating a new condition of use for a drug. And the changes at issue here—the omission of irrelevant and unnecessary dispensing information—plainly cannot be characterized as doing so.

**III.** Lastly, FDA acted reasonably in approving Teva's generic application and denying Vanda's citizen petition. Vanda asserts that FDA's decisions were arbitrary and capricious in three ways, none of which withstands scrutiny.

First, Vanda asserts that FDA's application of the different-manufacturer exception here reflected a change in position from the one the agency took in *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011). But FDA took no position on the scope of the exception in *PLIVA*. That case concerned whether an already-approved generic drug could make unilateral changes to its labeling to convey additional safety warnings and thus did not address the application of the different-manufacturer

exception during FDA's initial approval process. Vanda ignores relevant context in arguing otherwise.

Second, Vanda argues that FDA failed to address safety concerns related to the omission of braille from Teva's generic label. But FDA reasonably explained in both approving Teva's generic application and denying Vanda's citizen petition that the omission of braille would not render the generic version of tasimelteon any less safe or effective. Indeed, FDA addressed at length the arguments and supporting material Vanda presented in its petition. That reasoned explanation more than sufficed to meet the highly deferential standard for arbitrary-and-capricious review.

Third, Vanda contends that FDA's approval of another generic version of tasimelteon, which did include braille on its label, renders the approval here arbitrary. Vanda's argument, however, only underscores its misunderstanding of the different-manufacturer exception, which allows labeling changes that reflect the optional choices generic manufacturers may make about their products. That a different manufacturer declined to take advantage of that option does not mean that FDA acted arbitrarily in approving both generic applications.

## STANDARD OF REVIEW

This Court reviews the district court's "order granting summary judgment *de novo*." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017) (quotation marks omitted).

## ARGUMENT

### I. FDA Correctly Applied The Same-Labeling Requirement.

#### A. The Act Allows Labeling Changes That Reflect Optional Choices By Generic Manufacturers.

**1.** Congress enacted the Hatch-Waxman Amendments to increase competition among drug manufacturers and to reduce the expense of approved drugs. The Act provides an abbreviated pathway for the approval of generic versions of brand-name drugs "to speed the introduction of low-cost generic drugs to market." *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405 (2012).

Generally, to market a brand-name drug, a manufacturer must submit, and FDA must approve, a new drug application that includes, among other things, sufficient data to show that the drug is safe and effective if used as instructed on the labeling. 21 U.S.C. § 355(b)(1)(A)(i), (vi), (d). For prescription drugs, FDA's implementing regulations impose certain requirements regarding information that

must appear on the drug's label, *see, e.g.*, 21 C.F.R. §§ 201.50, 201.100(b), as well as requirements on the content and format of the prescribing information that accompanies the drug, *see, e.g.*, *id.* § 201.57.

The brand-name manufacturer is ultimately responsible for "crafting an adequate label" within these bounds. *Wyeth v. Levine*, 555 U.S. 555, 571 (2009). Manufacturers choose what to propose in the labeling they submit to FDA in the first instance and have some latitude in doing so. FDA evaluates the submission in the context of the labeling choices proposed by the manufacturer and the limitations imposed by statute and regulations. *See* 21 U.S.C. § 355(d). Accordingly, at least in some circumstances, a brand-name manufacturer may voluntarily include on its label information not strictly required by the statutory and regulatory scheme or may repeat required information in a different format.

**2.** The pathway and requirements for approval of a generic drug are different. A would-be generic manufacturer files an abbreviated new drug application that "piggy-back[s]" in key respects on an approved new drug application. *Caraco Pharm. Lab'ys, Ltd.*, 566

U.S. at 405. Such an abbreviated application requires generic manufacturers to show that their drugs are the "same" as their brand-name counterparts in certain respects. *See* 21 U.S.C. § 355(j)(2)(A)(ii), (iii), (v). A generic manufacturer must show that "the generic drug has the same active ingredients as … the brand-name drug." *Caraco Pharm. Lab'ys*, 566 U.S. at 405; *see* 21 U.S.C. § 355(j)(2)(A)(ii). The manufacturer also must show, among other things, that "the route of administration, the dosage form, and the strength" of the generic drug "are the same as those of the" brand name drug. 21 U.S.C. § 355(j)(2)(A)(iii). These approval requirements allow a generic to rely on the previous finding of safety and effectiveness for the brand-name drug and ensure that the generic drug is as safe and effective as its brand-name counterpart.

But the Act also contemplates that generic drugs may differ from their brand-name counterparts in certain respects, provided that the differences would not materially affect the safety and effectiveness of the generic drug. For example, while a generic drug must contain the same active ingredient as the brand-name drug, it may contain different inactive ingredients. *See* 21 U.S.C. § 355(j)(2)(A)(ii), (j)(4)(H). Likewise,

while brand-name and generic manufacturers must submit information on the manufacturing, processing, and packing of the drug, the Act does not require that these processes be the same. *See* 21 U.S.C. § 355(b)(1)(A)(iv), (j)(2)(A)(vi). The Act thus affords generic manufacturers some measure of latitude to differ from their brand-name counterparts in certain respects—including as to the manner in which their products are formulated and manufactured—so long as the differences do not jeopardize the safety and effectiveness of the generic drug.

**3.** The Act similarly imposes "different federal drug labeling duties" on "generic drug manufacturers." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 613 (2011). Generally, manufacturers seeking approval to market generic versions of brand-name drugs must show that the "labeling proposed for the new drug is the same as the labeling approved for the" brand-name drug. 21 U.S.C. § 355(j)(2)(A)(v). Consistent with the rest of the statutory scheme, the requirement ensures that generic drugs can piggyback on the brand-name manufacturer's showing that the drug is safe and effective when used as directed on the brand-name drug's labeling—the subject of robust

assessment by FDA at the time of the brand-name drug's approval. In addition, as FDA explained in the preamble to regulations implementing the Hatch-Waxman Amendments, "[c]onsistent labeling will assure physicians, health professionals, and consumers that a generic drug is as safe and effective as its brand-name counterpart." *Abbreviated New Drug Application Regulations*, 57 Fed. Reg. 17,950, 17,961 (Apr. 28, 1992).

Thus, a generic manufacturer cannot change its labeling simply because it believes that the brand-name drug's approved labeling could be improved to enhance safety and efficacy. A generic manufacturer cannot, for example, propose what it believes to be a better description of the strength and dosing regimen originally approved for the brand-name drug, even if it could demonstrate that the alternative description would render the drug safer or more effective when used according to that labeling. In such circumstances, if a generic manufacturer "believes new safety information should be added to a product's labeling, it should contact FDA, and FDA will determine whether the labeling for the generic and [brand-name] drugs should be revised." 57 Fed. Reg. at 17,961.

The same-labeling requirement, however, is subject to a statutory exception that allows labeling differences that are "required … because the new drug and the [brand-name] drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v). That exception has no application in circumstances—like those discussed above—where a generic manufacturer seeks to improve on or otherwise alter the labeling features that are necessary to ensure that the drug can be used safely and effectively for the purposes for which it is intended. Such changes deviate from the Hatch-Waxman Amendments' fundamental principle that the generic drug relies on FDA's prior finding of safety and effectiveness for the brand-name drug.

But the exception does permit generic manufacturers to deviate from the brand-name labeling in certain circumstances where those same safety and effectiveness concerns would not be materially affected. The exception allows labeling differences that reflect the optional choices generic manufacturers are permitted to make about their products. Most notably, FDA has consistently understood the different-manufacturer exception to allow differences in labeling that reflect permissible "differences in … formulation." 21 C.F.R. § 314.94(a)(8)(iv).

Accordingly, if a generic manufacturer elects to formulate its product with a different inactive ingredient than the brand-name drug, the exception permits labeling differences that reflect that change. For that reason, if a brand-name drug elects to include a gluten-free statement in its labeling, a generic manufacturer "is not required to include such a statement in its labeling to comply with the same labeling requirement" because the different manufacturer exception allows "differences in labeling to reflect permissible differences in the formulation of the drug products." JA722 [AR000336]. Likewise, FDA has approved a "generic product that did not include halal and kosher certifications in their labeling, where the [brand-name drug] did." JA921 [AR000885].

The Fourth Circuit endorsed that exact interpretation of the different-manufacturer exception in *Zeneca, Inc. v. Shalala*, 213 F.3d 161 (4th Cir. 2000). There, a brand-name manufacturer challenged FDA's approval of a generic competitor that reformulated the brand-name drug "by adding [a sulfite] preservative." *Id.* at 165. The generic drug's labeling reflected the difference in formulation and included a corresponding safety warning for sulfite allergies that the brand-name labeling did not. *Id.* at 166. The court rejected the brand-name

manufacturer's argument that the labeling changes contravened the Act's same-labeling requirement, concluding that the changes "fit squarely within" the different-manufacturer exception. *Id.* at 169. Adopting FDA's longstanding understanding of the exception, the court explained that "[b]ecause a difference in preservative is a permitted variation in formulation," the different-manufacturer exception "allow[ed] corresponding differences in labeling to identify the preservative and provide any appropriate warnings." *Id.*

This Court too has upheld FDA's approval of labeling changes that reflect a generic manufacturer's permissible choices about its product. In *Bristol-Myers Squibb Co. v. Shalala*, a brand-name manufacturer challenged FDA's approval of a generic competitor with labeling that omitted one or more of the brand-name drug's listed indications—the conditions the drug is approved to treat. 91 F.3d 1493, 1499 (D.C. Cir. 1996). The generic manufacturer elected to omit the indications to avoid infringing the brand-name manufacturer's patent and exclusivity rights, *id.*, rather than opting to delay approval until the relevant patent expired or to certify that that the patent was invalid, *see* 21 U.S.C. § 355(j)(2)(A)(vii)(III)-(IV). This Court held that the same-

labeling requirement did not preclude the approval of the generic drug, agreeing with FDA that the different-manufacturer exception "accommodate[d] the situation in which the generic drug manufacturer" elected to seek approval "for fewer than all of the indications of the pioneer manufacturer's drug." *Bristol-Myers Squibb*, 91 F.3d at 1500 (quotation marks omitted). As the Court explained, the Act "expresses the legislature's concern that the new generic be safe and effective for each indication that will appear on its label; whether the label for the new generic lists every indication approved for use of the pioneer is a matter of indifference." *Id.*

This Court reached a similar conclusion in *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44 (D.C. Cir. 2013) (per curiam). There, a brand-name drug's labeling voluntarily included a statement regarding a specific method for peanut-protein testing used by the manufacturer. *See Hill Dermaceuticals, Inc. v. FDA*, 2012 WL 5914516, at *3 (D.D.C. May 18, 2012) *aff'd per curiam*, 709 F.3d 44. FDA approved a generic version in which the manufacturer elected to remove the statement from the drug's labeling consistent with nonbinding agency guidance advising that such testing—and, by extension, labeling—was

"unnecessary to protect the public health." *Id.* at *15. The district court concluded that the "the 'different manufacturers' exception allow[ed] the difference in labeling," *id.* at *17, and this Court affirmed relying on FDA's regulation implementing the exception, *Hill Dermaceuticals*, 709 F.3d at 48.

Taken together, the decisions reflect the longstanding consensus that the exception permits labeling changes that reflect the optional choices the statutory scheme allows generic manufacturers to make, so long as the changes do not materially affect the generic drug's safety and effectiveness. That understanding of the exception makes sense in light of the Act's structure and purpose. Generic manufacturers could always formulate or manufacture their products in the same manner—and, by extension, use the same labeling—as their brand-name counterparts. It makes little sense, however, to read the same-labeling requirement as foreclosing generic manufacturers' ability to make changes that the Act otherwise allows. Moreover, it would undermine the very purpose of the Hatch-Waxman Amendments if brand-name manufacturers could leverage the same-labeling requirement to force their generic counterparts to follow costly formulation decisions or

manufacturing processes that they were not otherwise required to follow, purely to increase the complexity of market entry and thwart competition. *Cf. PLIVA*, 564 U.S. at 612.

### B. The Different-Manufacturer Exception Allowed Changes To The Voluntary Labeling Features At Issue Here.

**1.** One of the "optional choices" that the statutory and regulatory scheme allows generic manufacturers to make is changes to "voluntarily adopted forms of presenting information" that "will not diminish" or otherwise materially affect "the drug's safety or efficacy." JA24, JA34 [Dkt. 61, at 13, 23]. Such changes do not implicate the Act's "core function of ensuring that generic drugs are as safe and effective as their pioneer counterparts." JA33 [Dkt. 61, at 22]. Rather, like the decision of which preservative to use in a drug's formulation or whether to manufacture a drug in a halal or kosher manner, the decision whether to copy voluntary label features that do not materially affect the drug's safety or effectiveness is left to the discretion of generic manufacturers. That is why FDA routinely approves generic labeling that differs from the brand-name drug's routine color, font, and formatting choices. JA921 [AR000885]. And it is why in *Hill*

*Dermaceuticals*, FDA concluded that the different-manufacturer exception allowed the generic manufacturer to omit the statement regarding peanut-protein testing—the change fell within the exception's scope precisely because the statement "was not mandated by the FDA" in the first instance and was deemed "unnecessary to protect the public health." 2012 WL 5914516, at *3, *15.

The latitude afforded generic manufacturers makes sense in light of the Act's broad definition of labeling. *See* 21 U.S.C. § 321(m). A narrow reading of the same-labeling requirement would force generic manufacturers to copy every minute aspect of a brand-name drug's labeling, such as the graphics included in the drug's packaging, the font used for the drug's package insert, and the color of the drug's container. And that requirement would apply, even where labeling elements adopted by the brand-name manufacturer were not required by statute or regulation and where they in no way served Congress's underlying "concern that the new generic be safe and effective." *Bristol-Myers Squibb*, 91 F.3d at 1500.

**2.** FDA correctly applied the different-manufacturer exception in approving the labeling differences at issue here. Although Teva's

proposed generic labeling differed in several respects from Hetlioz's labeling, Vanda challenges only the decision to omit the repetition of the drug's name and strength in braille from Teva's container label. Those changes, however, were only to the "label's form, not its content—and the form was itself voluntary." JA32-33 [Dkt. 61, at 21-22]. Because Teva's omission of braille reflected "safe changes to voluntary label features," they were appropriate under the different-manufacturer exception. JA26 [Dkt. 61, at 15].

There is no dispute that the inclusion of braille on Hetlioz's label was "a voluntary step" taken "on Vanda's initiative." JA728 [AR000477]. Vanda proposed to include in Roman script the brand name and strength of the drug on Hetlioz's container label. Vanda also proposed to repeat that information in braille. The proposed inclusion of braille was voluntary because the "Act and its implementing regulations do not require any braille in labeling, including repetition in braille of information already in labeling in Roman script." JA923 [AR000887].

FDA, moreover, "did not consider braille necessary for the safe and effective use of Hetlioz." JA923 & n.60 [AR000887]. FDA

requested a labeling comprehension study to assess the potential risk that the inclusion of braille on the container label would *increase* medication errors and, after reviewing the results of Vanda's study, concluded that the inclusion of braille was "acceptable" from a medication errors perspective. JA923-24 [AR000887-888]. FDA also recommended Vanda include in Roman script the corresponding statements: "Dispense in original container. Do not cover the Braille." JA796 [AR000697]. But "no evidence was … presented to FDA that the inclusion of the proprietary name and strength in braille or the statements 'Dispense in original container' and 'Do not cover [the] Braille' were needed for the safe and effective use" of Hetlioz. JA922 & n.56 [AR000886]. In fact, "[i]nformation essential to the safe use of the drug, such as dosing instructions and warnings, is not presented in braille." JA924 [AR000888]. Thus, while FDA approved Vanda's new drug application for Hetlioz, including its proposed labeling, the "inclusion of braille language was not [a] condition of approval." JA589 [AR000019].

FDA further concluded that the omission of braille and the braille-related statements from Teva's labeling "would not render the generic

tasimelteon product[] less safe or effective" than Hetlioz. JA918 & n.31 [AR000882]. FDA determined that although the inclusion of braille was a "nice idea" that "probably helps with public relations," JA590 [AR000020], it was "not necessary for the safe and effective use of the product," JA918 & n.31 [AR000882]. FDA further determined that the braille-related statements were "irrelevant and unnecessary if a generic tasimelteon … product does not include braille in its container labeling." JA926 [AR000890].

FDA confirmed that the labeling changes did not raise safety concerns in denying Vanda's citizen petition, which was filed after Teva's generic product had already entered the market. FDA explained that despite "continuously monitor[ing] the safety of approved drug product[]," the agency had "not yet seen a safety signal related to the inclusion or omission of braille and the two associated statements in the labeling of a tasimelteon" and that there was no indication "that patients will confuse their tasimelteon products with other medications or that medication errors will result because" of the labeling changes. JA925 [AR000889].

Accordingly, the different-manufacturer exception permitted the labeling change at issue here because the repetition of information in braille "was not mandated by the FDA" in the first instance and was deemed "unnecessary to protect the public health." *Hill Dermaceuticals*, 2012 WL 5914516, at *3, *15. Indeed, in some ways, this case is more straightforward than a case like *Hill Dermaceuticals*. Whereas the information about peanut-protein testing at issue there was removed entirely from the generic's labeling, this case involves "changes to voluntarily adopted forms of presenting information on the brand-name label where the generic one conveys the same information." JA34 [Dkt. 61, at 23]. The changes are thus only to the "label's form, not its content—and the form was itself voluntary." JA32-33 [Dkt. 61, at 21-22].

### C. Vanda's Narrow Construction Of The Different-Manufacturer Exception Is Unworkable.

**1.** Vanda offers no coherent alternative to FDA's longstanding understanding of the statutory text. Vanda principally argues that FDA erred in applying the different-manufacturer exception because the statutory term "required" means that the exception must be construed narrowly to permit only changes that are "'needed' or

'obligatory.'" Vanda Br. 22. But Vanda does not actually encourage the Court to adopt that interpretation. There is no plausible argument that it is always "needed" or "obligatory" for a generic manufacturer to change the formulation of the drug and the accompanying description on the label or to change the font or color of the packaging. Those are optional choices by the generic manufacturer.

Vanda does not take issue with these accepted labeling changes. Instead, to account for the various court decisions and agency actions that are contrary to its preferred definition, Vanda is forced to argue that changes count as obligatory when justified by "law *or* circumstance," Vanda Br. 28 (emphasis added), or when optional changes are "otherwise permitted by FDA regulations," Vanda Br. 38, or when a generic manufacturer alters "the product itself," Vanda Br. 43, or when changes are "*de minimis*," Vanda Br. 45 n.4. This gerrymandered definition of what constitutes "a 'required' change," Vanda Br. 29—a definition in which nearly all prior FDA applications of the exception were permitted, but this one is not—demonstrates that the exception cannot be limited to strictly "needed or obligatory" changes as Vanda claims.

FDA's longstanding interpretation does far less violence to the statutory text. The key interpretative question concerns what changes are "required … because the new drug and the [brand-name] drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v). Ordinarily, the term "because" is understood to "indicate[] a but-for causal relationship." *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013) (quotation marks omitted). But-for causation is satisfied where the outcome "would not have occurred in the absence of—that is, but for—[the cause]." *Id.* at 346-47 (quotation marks omitted). The relevant feature—here, the presence of a new manufacturer—must be a cause of the change; it need not be the sole cause. *See Ponce v. Billington*, 679 F.3d 840, 845 (D.C. Cir. 2012) (explaining that "'sole' and but-for cause are very different").

As noted above, Vanda largely hinges its argument on the statute's use of the word "required." As the district court explained, "the word 'required' has a range of possible meanings." JA33 [Dkt. 61, at 22]. The term "often means 'need[ed]' or 'necessary.'" JA23 [Dkt. 61, at 12] (alteration in original) (quoting *Require*, Webster's Third New International Dictionary 1929 (1986)). But as Vanda recognizes, Vanda

Br. 31, "'required' can also" be understood to extend more broadly to "mean 'suitable or appropriate in a particular case,'" JA23 [Dkt. 61, at 12] (quoting *Require*, Webster's Third New International Dictionary 1929 (1986)).

Indeed, courts often treat the term "require" and its variants as imposing a standard short of strict necessity. For example, when interpreting a provision of the Railroad Retirement Act of 1974, this Court "reject[ed]" a "narrow, literal interpretation" of the "word 'require'" as necessarily "connot[ing] the idea of compulsion—an act which is mandatory or compelled." *Railway Lab. Execs.' Ass'n v. U.S. R.R. Ret. Bd.*, 749 F.2d 856, 861 (D.C. Cir. 1984). The Court explained that the statutory term may be "subject to varying interpretations," including one that imposed a standard short of actual compulsion. *Id.* Other courts have reached the same conclusion when addressing analogous language. *See, e.g.*, *Horn & Hardart Co. v. National R.R. Passenger Corp.*, 1985 WL 9426, at *3 (D.D.C. May 30, 1985) (explaining that "[a]lthough 'require' can … mean to demand as essential or 'to make indispensable,' the term as used in the context of the [at-issue] leases is not reasonably susceptible to such meaning"); *see*

*also id.* at *3 n.4 (explaining that "[t]here are a host of cases interpreting 'necessary' as not requiring absolute necessity" and citing examples).

As discussed, the different-manufacturer exception likewise does not limit permissible labeling changes to those that are "mandat[ed] or compelled" by the presence of a different manufacturer. *Railway Lab. Execs.' Ass'n*, 749 F.2d at 861. Rejecting that narrow reading makes sense in the context of the statutory scheme at issue here. It certainly pays no more respect to the statutory text to adopt a strict definition of "required" and then create a series of atextual exceptions to accommodate circumstances in which Vanda cannot stomach the results of its preferred interpretation of the statute.

**2.** Vanda's effort to distinguish the relevant cases underscores the point. Most notably, Vanda's reading cannot be squared with the recognition—as reflected in both FDA's regulations and the Fourth Circuit's decision in *Zeneca*—that the exception allows labeling changes that reflect "permitted variation[s] in formulation." 213 F.3d at 169; *see also* 21 C.F.R. § 314.94(a)(8)(iv). As explained, while the statutory scheme affords generic manufacturers the option to formulate their

products using inactive ingredients that differ from their brand-name counterparts or to employ different manufacturing processes than their brand-name competitors, *supra* p. 31, nothing "obligat[es]" them to do so, Vanda Br. 1. The generic manufacturer in *Zeneca* elected to formulate its drug using a sulfite preservative, just as manufacturers may elect to manufacture their drugs in a manner that is not halal, kosher, or gluten-free. Although labeling changes that reflect those voluntary choices are "appropriate" in light of the statutory scheme, *Require*, Webster's Third New International Dictionary 1929 (1986), they are not "needed or obligatory," Vanda Br. 22.

Vanda erroneously suggests that *Zeneca* "aligns with [its] reading of the different-manufacturer exception." Vanda Br. 38. But again, the labeling changes in *Zeneca* reflected a "permitted"—that is, optional—"variation" in the drug's formulation. 213 F.3d at 169. Vanda could not be clearer that, on its reading, "[l]abeling changes that are 'optional' … are not 'required' changes." Vanda Br. 29. That position cannot be reconciled with the holding of *Zeneca*. Vanda also suggests that the labeling changes at issue in *Zeneca* must be permitted because "[o]therwise, that permissible variation [in formulation] would be

pointless, as the drug label might not be safe or accurate unless modified to account for it." Vanda Br. 38. Indeed, but that hardly bolsters Vanda's position; rather, it only underscores that Vanda's narrow reading of the different-manufacturer exception cannot be squared with the statutory scheme.

Equally unpersuasive are Vanda's attempts to distinguish the various other examples detailed above in which the different-manufacturer exception allowed labeling changes that reflected the optional choices generic manufacturers made about their products. *See supra* pp. 34-37. Vanda suggests that the changes at issue in *Hill Dermaceuticals* were necessary to comply with FDA guidance, Vanda Br. 40, but as the district court in that case explained, the relevant guidance was expressly nonbinding, 2012 WL 5914516, at *17, so by definition it did not obligate the generic manufacturer to do anything. Likewise, Vanda stresses that the changes at issue in *Bristol-Myers Squibb* were made to avoid infringing on patent exclusivity rights, Vanda Br. 43, but the point is that the generic manufacturer voluntarily chose to omit an indication rather than pursue other available patent strategies that would have permitted the information

to be included in the generic labeling but would have delayed approval, *see* 21 U.S.C. § 355(j)(2)(A)(vii)(III)-(IV). And Vanda asserts that changes to a generic label's color, arrangement, and design are necessary to protect the brand-name product's trade dress. Vanda Br. 44. But even if certain labeling features may constitute protected trade dress, *cf. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992), Vanda nowhere suggest that every change to a generic product's labeling—which may include such non-distinctive design features as differences in font or color—is necessary to "comply with intellectual property laws or to avoid misleading statements," Vanda Br. 44; *see Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 216 (2000) (holding that "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning").

**3.** Vanda's remaining arguments regarding the exception are equally unavailing. Vanda asserts that FDA's approval of another generic version of tasimelteon, which did include braille on its proposed labeling, demonstrates that the omission of braille on Teva's label "was not a 'required' change." Vanda Br. 29. But as explained, the different-manufacturer exception permits the change at issue here because one of

the "optional choices" that the statutory and regulatory scheme allows generic manufacturers to make is "safe changes to voluntary label features," like whether to include braille, JA24, JA26 [Dkt. 61, at 13, 15]. That another generic manufacturer declined to exercise that option does not render Teva's label invalid, just as it would not have rendered the labeling at issue in *Zeneca* invalid had FDA approved another generic that elected to formulate its product with the same preservative as the brand-name competitor.

Vanda is also wrong in asserting that FDA's interpretation of the exception is foreclosed by the Supreme Court's decision in *PLIVA*. Vanda Br. 34-35 (citing 564 U.S. at 618). That case concerned "whether, and to what extent, generic manufacturers may change their labels *after* initial FDA approval" to unilaterally include a new safety warning not in the brand-name drug's labeling. *PLIVA*, 564 U.S. at 613 (emphasis in original). The decision nowhere addressed what labeling differences are permissible under the different-manufacturer exception during FDA's initial approval process—the question presented here.

Finally, Vanda spends considerable time arguing that the district court improperly deferred to the agency's interpretation of the statute.

Vanda Br. 40-44. That too is mistaken. In *Loper Bright Enterprises v. Raimondo*, the Supreme Court made clear that when "exercis[ing] independent judgment in determining the meaning of statutory provisions…, courts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes." 603 U.S. 369, 394 (2024); *see also Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2455 (2025) (same). That is precisely what the district court did here: The court recognized that FDA's "expertise and practice" lacked the "'power to control' in this context," but it reasoned that FDA's interpretation had "ample 'power to persuade,'" given the agency's "repeated approvals of comparable changes in generic label[s]." JA27 [Dkt. 61, at 16] (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). The court thus exercised its "independent judgment in determining the meaning" of the statutory provision at issue here just as the Supreme Court requires. *Loper Bright Enters.*, 603 U.S. at 394.

## II. FDA Correctly Applied The Conditions-Of-Use Requirement.

Vanda fares no better by recharacterizing its argument as a contention that Teva's generic drug has been approved for a new

condition of use in violation of the statute. As explained, the fundamental premise of the Hatch-Waxman Amendments is that abbreviated new drug applications may be approved only insofar as the generic drug is intended to be used in circumstances for which the brand-name drug has already been approved. For that reason, the very first requirement for an abbreviated new drug application is that the generic manufacturer must "show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for" the brand-name drug. 21 U.S.C. § 355(j)(2)(A)(i); *see also id.* § 355(j)(4)(B). Thus, a generic manufacturer cannot obtain approval to use new instructions, to treat a new population, or to include a new indication. *See ViroPharma, Inc. v. Hamburg*, 916 F. Supp. 2d 76, 80 (D.D.C. 2013) (noting that FDA typically understands "conditions of use" to encompass such circumstances as "how, to whom, and for what purpose the drug is administered" (quotation marks omitted)).

The approval of Teva's generic application satisfied that requirement. There is no dispute that Teva's generic version of tasimelteon is utilized under the same circumstances as the brand-

name drug. It treats the same conditions in the same population using the same instructions as the brand-name version. And as discussed above, nothing about the approved labeling differences materially alters the safety or efficacy of the drug or otherwise suggests that the generic version will be used in a manner different from the original in any meaningful respect.

Vanda nonetheless argues that FDA's approval of Teva's label violated the conditions-of-use requirement because it does not contain the braille-related statements "Dispense in original container. Do not cover the Braille." Vanda Br. 46.[1] But Vanda makes little effort to map this contention onto the statutory provision on which it relies. Under the statute, the question is whether Teva has sought approval for a condition of use for which Vanda had not previously obtained approval. Vanda thus fundamentally misunderstands the relevant inquiry in emphasizing that the statements on its own label constitute a condition of use. Vanda Br. 49. The inquiry is whether the generic drug is approved for any new conditions of use, not whether the generic drug's

[1] Vanda does not argue that any other labeling changes violated the conditions-of-use requirement. *See* Vanda Br. 46-48.

labeling replicates in full the language on the brand-name drug's label. By its plain terms, the provision requires only that the conditions of use included in a generic drug's labeling be "previously approved" for the brand-name drug. 21 U.S.C. § 355(j)(2)(A)(i).

That understanding is confirmed by this Court's decision in *Bristol-Myers Squibb*. As explained, the generic manufacturer there omitted approved indications from its labeling to avoid infringing on the brand-name manufacturer's patent and exclusivity rights consistent with the different-manufacturer exception. 91 F.3d at 1499. So while there were approved conditions of use included on the brand-name labeling—namely, the omitted indications—that the generic drug did not include on its labeling, that was not relevant to the inquiry. Rather, because all of the generic drug's conditions of use had been previously approved for the brand-name drug, the requirement was readily satisfied. As this Court explained, the conditions-of-use requirement and different-manufacturer exception "work[ed] in harmony" and "accommodate[d] the situation in which the generic drug manufacturer" elected to seek approval "for fewer than all of the indications of the pioneer manufacturer's drug." *Bristol-Myers Squibb*, 91 F.3d at 1500

(quotation marks omitted). The Act's underlying "concern" is whether the generic drug is "safe and effective," and it "is a matter of indifference" whether "the label for the new generic lists every indication" or other condition of use as the brand-name drug. *Id.*

Vanda only underscores its misapprehension of the statute in arguing that the omission of the braille-related statements "necessarily" creates a new condition of use. Vanda Br. 47. Obviously, while any deviation from the brand-name drug's labeling could in theory be cast as a new condition of use—for example, the drug is authorized for use only when it was dispensed in a bottle bearing the trade name Hetlioz—that is plainly not the sense in which Congress used the term. For that reason, FDA has long understood conditions of use not to encompass "all contents of the drug product's labeling." JA926 [AR000890]. That follows from the plain meaning of the term's component parts. "[C]onditions" means "circumstance[s] that [are] essential to the appearance or occurrence of something." *Condition*, Webster's Third New International Dictionary 473 (1986). And "use" means "to put into action or service," "to expend or consume by putting to use," or "to consume or take (as liquor or drugs) regularly." *Use*, Webster's Third

New International Dictionary 2523-24 (1986). As discussed above, nothing about the braille-related statements were "essential" to the safe and effective "consum[ption]" of Teva's generic product. To the contrary, FDA explained that once the braille was omitted from Teva's label, the statements were "irrelevant and unnecessary." JA926 [AR000890].

Vanda's arguments to the contrary rest on the contention that any statement concerning a drug's distribution to a patient counts as a condition of use. Vanda Br. 46 (asserting that "[c]onditions of use include a wide array of instructions related to the use or administration of a drug"). That contention essentially just replicates the untenable argument that no changes whatsoever should be allowed between the brand-name labeling and the generic labeling. Far from foreclosing all potential differences between a generic drug's label and that of its brand-name counterpart, including changes otherwise permitted by the different-manufacturer exception, the conditions-of-use requirement plays a separate and more basic role. It ensures that the generic drug can rely on the prior finding of safety and effectiveness of the brand-name drug by foreclosing the generic from adding conditions of use that

have not been previously approved. And although FDA may, in some circumstances, determine that various factors other than those related to such core matters as who takes the drug, how it is taken, and what conditions it treats are significant enough to the manner in which the drug is actually utilized by the patient to create a new condition of use, that is plainly not the case here.

## III. FDA's Decisions Were Reasonable.

Lastly, Vanda argues that FDA's decisions approving Teva's generic application and denying Vanda's citizen petition were arbitrary and capricious. According to Vanda, FDA acted unreasonably because the agency (1) changed position without explanation, (2) failed to adequately account for safety concerns, and (3) treated like situations differently. Vanda Br. 51. None of those assertions withstands scrutiny.

### A. FDA Did Not Change Its Position On The Different-Manufacturer Exception.

Where an agency changes position, it must "display awareness that it is changing position" and "provide [a] reasoned explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis omitted). Vanda argues that FDA's application of the

different-manufacturer exception here violated that requirement because it "necessarily disavowed" the position the agency took in *PLIVA*. Vanda Br. 53 (citing Brief for the United States as *Amicus Curiae* Supporting Respondents, *PLIVA*, 564 U.S. 604 (No. 09-993), 2011 WL 741927). FDA, however, took no position on the scope of the exception in *PLIVA*. Accordingly, there was no change of position, much less one that lacked a reasoned explanation.

As explained, *PLIVA* concerned "whether, and to what extent, generic manufacturers may change their labels *after* initial FDA approval" to unilaterally include a new safety warning not in the brand-name drug's labeling. 564 U.S. at 613 (emphasis in original). In that context, FDA explained that "an [abbreviated new drug application] holder may not unilaterally change its approved labeling" and may not "deviate from the brand-name labeling." Brief for the United States as Amicus Curiae Supporting Respondents, *PLIVA*, 564 U.S. 604 (No. 09-993), 2011 WL 741927, at *16. FDA never addressed in that case whether and to what extent labeling changes are permitted pursuant to the different-manufacturer exception during FDA's initial approval process. The government's amicus brief thus made clear that the

exception was "not relevant" to the question presented in *PLIVA*. *Id.* at *17. Indeed, FDA has consistently maintained both before and after *PLIVA*—including in cases like *Bristol-Myers Squibb* and *Hill Dermaceuticals*—that the different-manufacturer exemption permits a generic drug's labeling to deviate from its brand-name counterpart in certain circumstances. Vanda simply ignores this context in arguing that the agency's actions here represent an "unacknowledged shift in position." Vanda Br. 54.

**B. FDA Reasonably Addressed All Safety Concerns.**

Vanda also argues that FDA acted arbitrarily in failing to address safety concerns related to the omission of braille from Teva's label. Vanda Br. 55. That argument too fails.

**1.** This Court "must uphold an agency's action where it has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *National Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (quotation marks omitted). The "standard is highly deferential, and it presumes the validity of agency action." *Id.* (alteration and quotation marks omitted). Where, as here, the agency action relied on a "scientific

determination" within "its area of special expertise," a court "must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. National Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

FDA easily cleared that low bar here. As explained, in evaluating Teva's generic application, FDA requested input from various internal offices "regarding whether the labeling for the generic tasimelteon products should include braille." JA918 & n.31 [AR000882]; *see also* JA589-92 [AR000019-22]. FDA determined that while the inclusion of braille was a "nice idea" that "probably helps with public relations," JA590 [AR000020], it was "not … necessary for the safe and effective use of the product," JA924 [AR000888]. FDA thus reasonably concluded that omitting braille and the braille-related statements from Teva's labeling "would not render the generic tasimelteon product[] less safe or effective" than Hetlioz. JA918 & n.31[AR000882].

FDA confirmed that conclusion in denying Vanda's citizen petition. FDA considered at length the arguments and supporting material presented in Vanda's petition. JA920-26 [AR000884-90]. It rejected Vanda's contention that "the inclusion of the strength (or a product name) in braille and the associated statements is necessary for

the safe and effective use of the drug product," JA923 [AR000887], explaining that Vanda did not "provide[] sufficient support, nor have we independently identified sufficient support, for these claims," JA925 [AR000889]. To the contrary, FDA explained that following the approval and entry into the market of Teva's product, the agency had not "seen a safety signal related to the inclusion or omission of braille and the two associated statements in the labeling," despite "continuously monitor[ing] the safety of approved drug products." JA925 [AR000889].

**2.** Vanda purports to identify various defects in FDA's consideration of Teva's generic application and Vanda's citizen petition. Vanda's arguments wholly ignore the highly deferential standard for reviewing agency action of this kind and are wrong in any case.

Vanda asserts that FDA acted unreasonably because when evaluating Teva's application, different offices within the agency provided different views on the propriety of omitting braille from the label. Vanda Br. 55-58. But as FDA explained, it "concluded that the omission of braille would not render the generic tasimelteon products less safe or effective" "[a]fter considering the totality of the views from

the various subject matter experts within these offices." JA918 & n.31 [AR000882]. It was hardly arbitrary and capricious for the agency to consider different views and reach a conclusion based on the totality of the circumstances.

Vanda further contends that FDA should have "considered the safety information contained in Vanda's original application" when evaluating Teva's generic application. Vanda Br. 56. But the labeling comprehension study and third-party guidelines referenced in Vanda's application in no way addressed the specific question of whether omitting braille from Teva's generic label would jeopardize the safety and effectiveness of the generic product. FDA, moreover, had already determined after reviewing Vanda's application that it "did not consider braille necessary for the safe and effective use of Hetlioz." JA923 & n.60 [AR000887]. FDA explained that "no evidence was … presented" showing that "the inclusion of the proprietary name and strength in braille or the statements 'Dispense in original container' and 'Do not cover the Braille' were needed for the safe and effective use" of Hetlioz. JA922 & n.56 [AR000886]. There was no need for FDA to revisit that

conclusion, or the materials underlying it, in evaluating Teva's generic application.

Vanda is also wrong in asserting that FDA did not "meaningfully consider[]" arguments and supporting material that Vanda raised in its petition. Vanda Br. 60. The record makes clear that FDA addressed Vanda's various arguments and supporting material at length, including the studies that Vanda contends support its view. Indeed, Vanda's assertions that FDA "nitpick[ed]," "criticized," and "objected" to Vanda's studies only underscore that conclusion. Vanda Br. 58-59. FDA's decision "demonstrates that the agency considered and rejected [Vanda's] arguments," which is "all that the APA requires." *City of Waukesha v. EPA*, 320 F.3d 228, 258 (D.C. Cir. 2003) (per curiam). That Vanda disagrees with that outcome does not render the decision arbitrary and capricious—Vanda cannot "substitute [its] judgment for that of the agency," any more than this Court can. *National Ass'n of Clean Air Agencies*, 489 F.3d at 1229 (quotation marks omitted).

### C. FDA Did Not Treat Similarly Situated Generic Applications Differently.

Lastly, Vanda asserts that FDA's approval of another generic version of tasimelteon that did include braille on its proposed labeling

demonstrates that the agency's approval of Teva's generic was unreasonable. Vanda Br. 60-61. This is merely a repackaging of Vanda's statutory-interpretation argument, and it is equally unpersuasive. Of course, "[i]t is a fundamental principle of administrative law that agencies must treat like cases alike." *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1242 (D.C. Cir. 2023). But as explained, FDA did so here by recognizing that both generic manufacturers had the "optional choice[]" to make "safe changes to voluntary label features," like deciding whether to include braille on their labeling. JA24, JA26 [Dkt. 61, at 13, 15]. That different manufacturers made different "optional choices" does not mean that FDA acted arbitrarily in approving both generic applications, just as it would not have been arbitrary had FDA approved another generic application that elected to formulate its product with the same preservative as the brand-name competitor in *Zeneca*.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
*/s/ David L. Peters*
DAVID L. PETERS
*Attorney, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 598-6735*
*david.l.peters@usdoj.gov*

October 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,988 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ David L. Peters*
David L. Peters

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ David L. Peters*
David L. Peters

# ADDENDUM

## TABLE OF CONTENTS

21 U.S.C. § 321 ........................................................................... A1

21 U.S.C. § 355(j)(2)(A)................................................................. A1

21 C.F.R. § 314.94(a)(8)(iv) ........................................................... A4

21 C.F.R. § 314.127(a)(7)............................................................... A5

**21 U.S.C. § 321(k), (m)**

**§ 321. Definitions; generally**

For the purpose this chapter—

…

(k) The term "label" means a display of written, printed, or graphic matter upon the immediate container of any article; and a requirement made by or under authority of this chapter that any word, statement, or other information appear on the label shall not be considered to be complied with unless such word, statement, or other information also appears on the outside container or wrapper, if any there be, of the retail package of such article, or is easily legible through the outside container or wrapper.

…

(m) The term "labeling" means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.

…

**21 U.S.C. § 355(j)(2)(A)**

**§ 355. New Drugs**

…

(j) Abbreviated New Drug Applications

(1) Any person may file with the Secretary an abbreviated application for the approval of a new drug.

(2)

(A) An abbreviated application for a new drug shall contain—

(i) recommended, or suggested in the labeling proposed for the new drug have been previously approved for a drug listed under paragraph (7) (hereinafter in this subsection referred to as a "listed drug");

(ii)

(I) if the listed drug referred to in clause (i) has only one active ingredient, information to show that the active ingredient of the new drug is the same as that of the listed drug;

(II) if the listed drug referred to in clause (i) has more than one active ingredient, information to show that the active ingredients of the new drug are the same as those of the listed drug, or

(III) if the listed drug referred to in clause (i) has more than one active ingredient and if one of the active ingredients of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the other active ingredients of the new drug are the same as the active ingredients of the listed drug, information to show that the different active ingredient is an active ingredient of a listed drug or of a drug which does not meet the requirements of section 321(p) of this title, and such other information respecting the different active ingredient with respect to which the petition was filed as the Secretary may require;

(iii) information to show that the route of administration, the dosage form, and the strength of the new drug are the same as those of the listed drug referred to in clause (i) or, if the route of administration, the dosage form, or the strength of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), such information respecting the route of administration, dosage form, or strength with respect to which the petition was filed as the Secretary may require;

(iv) information to show that the new drug is bioequivalent to the listed drug referred to in clause (i), except that if the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in clause (i) and the new drug can be expected to have the same therapeutic effect as

the listed drug when administered to patients for a condition of use referred to in clause (i);

(v) information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers;

(vi) the items specified in clauses (ii) through (vi) of subsection (b)(1)(A);

(vii) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug referred to in clause (i) or which claims a use for such listed drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c)—

> (I) that such patent information has not been filed,
>
> (II) that such patent has expired,
>
> (III) of the date on which such patent will expire, or
>
> (IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and

(viii) if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

The Secretary may not require that an abbreviated application contain information in addition to that required by clauses (i) through (viii).

…

**21 C.F.R. § 314.94(a)(8)(iv)**

**§ 314.94. Content and format of an ANDA**

ANDAs are required to be submitted in the form and contain the information required under this section. Three copies of the ANDA are required, an archival copy, a review copy, and a field copy. FDA will maintain guidance documents on the format and content of ANDAs to assist applicants in their preparation.

(a) *ANDAs.* Except as provided in paragraph (b) of this section, the applicant must submit a complete archival copy of the abbreviated new drug application that includes the following:

…

(8) *Labeling* —

…

(iv) ***Comparison of approved and proposed labeling.*** A side-by-side comparison of the applicant's proposed labeling including, if applicable, any Medication Guide required under part 208 of this chapter with the approved labeling for the reference listed drug with all differences annotated and explained. Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the drug product must be the same as the labeling approved for the reference listed drug, except for changes required because of differences approved under a petition filed under § 314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers. Such differences between the applicant's proposed labeling and labeling approved for the reference listed drug may include differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(5)(F) of the Federal Food, Drug, and Cosmetic Act.

**21 C.F.R. § 314.127(a)(7)**

**§ 314.127. Refusal to approve an ANDA.**

(a) FDA will refuse to approve an ANDA for a new drug under section 505(j) of the Federal Food, Drug, and Cosmetic Act for any of the following reasons, unless the requirement has been waived under § 314.99:

…

(7) Information submitted in the ANDA is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug referred to in the ANDA except for changes required because of differences approved in a petition under § 314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers or because aspects of the listed drug's labeling are protected by patent, or by exclusivity, and such differences do not render the proposed drug product less safe or effective than the listed drug for all remaining, nonprotected conditions of use.