**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 25-5041**

---

***In the***

# United States Court of Appeals

***for the***

## District of Columbia Circuit

---

VANDA PHARMACEUTICALS INC.,
*Plaintiff-Appellant*,

– v. –

UNITED STATES FOOD AND DRUG ADMINISTRATION et al.,
*Defendants-Appellees*,

– and –

TEVA PHARMACEUTICALS, USA, INC.,
*Intervenor-Defendant-Appellee.*

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 23-cv-00280, Hon. Tanya S. Chutkan

---

**FINAL REPLY BRIEF FOR PLAINTIFF-APPELLANT**

---

PAUL W. HUGHES
SARAH P. HOGARTH
CONNOR J. SUOZZO
EMMETT WITKOVSKY-ELDRED
*McDermott Will & Schulte LLP*
*500 North Capitol Street NW*
*Washington, DC 20001*
*(202) 756-8000*

*Counsel for Plaintiff-Appellant*

## TABLE OF CONTENTS

Table of Authorities ........ ii

Glossary of Abbreviations ........ iv

Introduction ........ 1

Argument ........ 3

I. FDA's approval of Teva's generic label violates the same-labeling requirement. ........ 3

  A. Everyone agrees that Teva's removal of Braille was neither necessary nor obligatory—which makes it unlawful. ........ 3

  B. Defendants concede that Teva's removal of Braille was not "required" by avowing it was "optional". ........ 6

  C. Defendants' attempts to rewrite the different-manufacturer exception fail. ........ 10

    1. FDA's construction lacks any basis in the provision. ........ 10

    2. FDA's standard has no basis in precedent. ........ 13

    3. Teva misconstrues statutory terms. ........ 14

II. FDA's approval violated the conditions-of-use requirement. ........ 20

III. FDA's decisions were arbitrary and capricious. ........ 24

  A. FDA's position here is irreconcilable with its position in *PLIVA*. ........ 25

  B. FDA disregarded safety concerns. ........ 26

  C. FDA treated MSN and Teva differently. ........ 29

Conclusion ........ 30

## TABLE OF AUTHORITIES*

**Cases**

*ANR Pipeline Co. v. FERC*,
71 F.3d 897 (D.C. Cir. 1995) ........................................................ 26

*Baker Botts L.L.P. v. ASARCO LLC*,
576 U.S. 121 (2015) ........................................................ 11

*Bristol-Myers Squibb Co. v. Shalala*,
91 F.3d 1493 (D.C. Cir. 1996) ........................................................ 5, 13, 24

*Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*,
403 F.3d 771 (D.C. Cir. 2005) ........................................................ 29

*Calcutt v. Fed. Deposit Ins.*,
598 U.S. 623 (2023) ........................................................ 17

*Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*,
439 F.3d 715 (D.C. Cir. 2006) ........................................................ 27

*Eagle Pharms., Inc. v. Azar*,
952 F.3d 323 (D.C. Cir. 2020) ........................................................ 10, 11, 13

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........................................................ 22

*Hill Dermaceuticals, Inc. v. FDA*,
709 F.3d 44 (D.C. Cir. 2013) ........................................................ 13, 14

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ........................................................ 6

*Landstar Exp. Am., Inc. v. Fed. Mar. Comm'n*,
569 F.3d 493 (D.C. Cir. 2009) ........................................................ 11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ........................................................ 28

**PLIVA, Inc. v. Mensing*,
564 U.S. 604 (2011) ........................................................ 4, 5, 18, 25, 26

*Ry. Lab. Execs.' Ass'n v. U.S. R.R. Ret. Bd.*,
749 F.2d 856 (D.C. Cir. 1984) ........................................................ 14

---

* Authorities marked with an asterisk are those on which we chiefly rely.

**Cases—continued**

*Transmission Agency of N. Cal. v. FERC*,
628 F.3d 538 (D.C. Cir. 2010) .......... 28

*Zeneca, Inc. v. Shalala*,
213 F.3d 161 (4th Cir. 2000) .......... 5, 7, 8, 13

**Statutes**

21 U.S.C.
§ 355(d) .......... 21
§ 355(j)(2)(A)(i) .......... 20
§ 355(j)(2)(A)(ii) .......... 9
§ 355(j)(2)(A)(iv) .......... 9, 22
*§ 355(j)(2)(A)(v) .......... 4, 5, 8, 9, 25
*§ 355(j)(4)(G) .......... 3, 4, 12, 25
§ 355(j)(8)(B) .......... 4

**Regulations and Rules**

21 C.F.R. § 314.94(a)(8)(iv) .......... 20

Abbreviated New Drug Application Regulations,
57 Fed. Reg. 17,950 (Apr. 28, 1992) .......... 5

Fed. R. App. P. 32(c)(2)(A) .......... 9

**Other Authorities**

Br. for the United States as *Amicus Curiae* Supporting Resps.,
*PLIVA v. Mensing*, 564 U.S. 604 (2011)
(Nos. 09-993, 09-1039, 09-1501), 2011 WL 741927 .......... 25, 26

Br. of Fed. Defs., *Hill Dermaceuticals, Inc. v. FDA*,
709 F.3d 44 (2013) (No. 12-5182), 2012 WL 6721324 .......... 14

The Chicago Manual of Style (17th ed. 2017) .......... 18

Merriam-Webster Dictionary of English Usage 36 (1989) .......... 18

*Require*, Webster's Third New Int'l Dictionary 1929 (1986) .......... 15

*Required*, Doubleday Roget's Thesaurus in Dictionary Form
581 (1987) .......... 4

*Use,* Webster's Third New Int'l Dictionary 473 (1986) .......... 21

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **ANDA:** | abbreviated new drug application |
| **APA:** | Administrative Procedure Act |
| **DMEPA:** | Division of Medication Error Prevention and Analysis |
| **FDA:** | Food and Drug Administration |
| **FDCA:** | Federal Food, Drug, and Cosmetic Act |
| **NDA:** | new drug application |
| **Non-24:** | Non-24-Hour Sleep-Wake Disorder |
| **OGD:** | Office of Generic Drugs |

# INTRODUCTION

Defendants concede the dispositive facts. The Braille lettering and dispensing instructions are among the "labeling approved" for Hetlioz® (tasimelteon), and as such, those features undisputedly must be "the same" on generic labels unless an exception applies. The different-manufacturer exception authorizes labeling "changes" that are "required" because the two drugs are produced or distributed by different manufacturers. Both FDA and Teva emphatically proclaim that Teva's "change" to approved labeling features was "optional." But an "optional" change is, by definition, "not required." This alone resolves the case.

FDA nevertheless contends that Teva's unprompted omission of accommodations for a disproportionately blind population was "required" because it "reflects the optional choices generic manufacturers are permitted to make about their products." FDA Br. 33. We do not disagree with the broad principle FDA asserts: when a manufacturer makes an allowable change to its product, that may *require* a change to the label for accuracy.

But that rule says nothing about *this* case—Teva's label change was *not* required because of some change in the *product*. Rather, the only thing that defendants say "required" the change to the label was Teva's *decision to change the label*. FDA must admit as much, because MSN produced a generic with Braille on *its* label.

If that were enough to trigger the different-manufacturer exception to the same-labeling requirement, the broad rule would be a dead letter. Any generic could change any aspect of the label simply because it wanted to. This is not a remotely plausible reading of the text.

No doubt aware of the textual problem, defendants pivot and attempt to insert FDA's policy judgment as to when a generic may choose to change a label, untethered to any showing that the change was in fact required. But no statutory text supports this free-floating policy judgment. Rather, the text resolves this case: Generics must use the "same" label as the brand's, except when "changes" are "required" because the drugs are produced or distributed by different manufacturers. Because no change was "required" here, FDA's decision departed from the statutory mandate.

The ANDA approval also violated the conditions-of-use requirement. The dispensing instructions on Vanda's drug narrow the conditions of use by ensuring that patients use the drug from the same container and benefit from its accessibility features. By lifting that restriction for Teva, FDA unlawfully expanded the conditions of use.

Finally, FDA's actions were arbitrary and capricious multiple times over. These reasons all compel reversal.

## ARGUMENT

### I. FDA'S APPROVAL OF TEVA'S GENERIC LABEL VIOLATES THE SAME-LABELING REQUIREMENT.

The best—indeed, only—reading of the statutory same-labeling requirement and different-manufacturer exception compels Teva to include Braille lettering. Nothing "required" Teva to omit Braille and, thus, it had to include it. Defendants now admit what they must—Teva's omission of Braille was "optional." This was therefore not a change required because of a manufacturer difference. Nor is FDA's decision saved by the contention that some label changes may be required when a manufacturer makes permissive changes to the *product* itself. Defendants repeatedly point to what the law may hold in those circumstances—indeed, they have no other meaningful argument. FDA Br. 28-53; Teva Br. 27-44. But that is simply irrelevant to the issue here.

#### A. Everyone agrees that Teva's removal of Braille was neither necessary nor obligatory—which makes it unlawful.

All parties agree the same-labeling requirement applies—and that this case is about its exception. Under the general sameness requirement, the Braille and dispensing instructions that appear on the Hetlioz® label are undisputedly "approved" "labeling," for which the "labeling proposed" in Teva's ANDA was not "the same." 21 U.S.C. § 355(j)(4)(G).

The exception permits "changes *required* … because the new drug and the listed drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v), (j)(4)(G) (emphasis added). As Vanda showed in its opening brief (at 25-46), this text's plain meaning, reinforced by statutory structure and purpose, existing precedent, and another generic's label, proves Teva's optional removal of disability accommodations was contrary to statute.

*First*—the text. The ordinary meaning of "required" is "necessary" or "obligatory." Opening Br. 27-28 (citing *Required*, Doubleday Roget's Thesaurus in Dictionary Form 581 (1987), among other sources). Thus, when the exception applies, there is invariably something that *prompts* the labeling change with sufficient compulsion to call it "required" in ordinary speech. By contrast, an unprompted, optional labeling change that decreases accessibility for blind patients is not a required one.

*Second*—this plain meaning is reinforced by the statute's structure and purpose. It ensures the exception does not swallow the "same as" standard—which Congress chose over the more relaxed "not … significant difference" or "similar" standards used elsewhere in the section. *E.g.*, 21 U.S.C. § 355(j)(8)(B). And it protects Congress's assignment of "different federal drug labeling duties" to brand and generic manufacturers. *PLIVA, Inc. v.*

*Mensing*, 564 U.S. 604, 613 (2011); Opening Br. 33-34. Absent a plain-meaning construction, labeling differences would proliferate across multiple versions of the same drug, contrary to the uniformity directive embodied by the same-labeling requirement. *See* Abbreviated New Drug Application Regulations, 57 Fed. Reg. 17,950, 17,961 (Apr. 28, 1992) ("Consistent labeling will assure physicians, health professionals, and consumers that a generic drug is as safe and effective as its brand-name counterpart.").

*Third*, precedent supports Vanda's interpretation. *See* Opening Br. 38-40. The Supreme Court held that unilateral, optional labeling changes by generics are forbidden. *PLIVA*, 564 U.S. at 614. And this Court held that the different manufacturer exception "accommodate[s]" situations where a generic label "would *necessarily* include at least one fewer indication." *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1496, 1500 (D.C. Cir. 1996) (emphasis added). That *necessity* makes it a "required" change. *Id.* at 1500 (quoting 21 U.S.C. § 355(j)(2)(A)(v)); *accord Zeneca, Inc. v. Shalala*, 213 F.3d 161, 169 (4th Cir. 2000) (exception covers "labeling differences that are *necessary*" (emphasis added)).

*Finally*, another generic label was approved with Braille, confirming that nothing about Teva's labeling change was "required" or arises from any difference between the brand and a generic. Opening Br. 29-30. Indeed, it is

altogether *unnecessary* to remove disability accommodations for this medication.

In all, the statute accommodates certain label changes required by some external factor, but it does not allow generic manufacturers to simply make optional labeling choices.

### B. Defendants concede that Teva's removal of Braille was not "required" by avowing it was "optional".

Against all this, defendants double down on the district court's interpretation of "required" to mean its polar opposite: "optional." FDA Br. 27-28, 33, 37-38, 44, 49, 51, 66; *accord* Teva Br. 19, 26, 37. Or, as FDA put it originally, "not required." JA589 ("Braill [sic] is not required for the generics of Hetlioz."); *see also* JA440 (Teva's "decisions to … omit braille and the braille-related statements were … not required."); Opening Br. 28-29. Courts "certainly may not transmute existing statutory language into its polar opposite." *Jennings v. Rodriguez*, 583 U.S. 281, 304 (2018). Such "textual alchemy" ends this case. *Id.*

FDA starts with a noncontroversial premise. The exception allows labeling changes required by permissible alterations to the drug itself. FDA Br. 28-31. That is, FDA characterizes the exception as authorizing "labeling changes that reflect a generic manufacturer's permissible choices *about its product*," such as "permissible differences in the formulation of the drug

products" and changes made "to avoid infringing the brand-name manufacturer's patent and exclusivity rights." FDA Br. 34-36 (emphasis added).

We have no quarrel thus far. When a manufacturer makes a permissible change to the drug *itself*, "corresponding differences in labeling" become "required." *Zeneca*, 213 F.3d at 169. If a generic drug is formulated with a different inactive ingredient, it becomes *necessary and obligatory* (that is, "required") to list the correct ingredient—otherwise the drug would be misbranded. And if a generic drug would violate patent or exclusivity rights if manufactured or marketed a certain way, then it becomes necessary and obligatory to reflect the manufacturing change and remove the unlawful marketing from the label.

FDA takes this principle much too far in contending that optional labeling changes that "reflect[] 'changes to … label features'" are themselves "permissible choices." FDA Br. 35, 40. FDA postulates that "Teva's omission of Braille" is "permissible" because it "reflected" Teva's omission of Braille—it reflected *itself*. *Id.*

That reasoning is circular and would cause the exception to swallow the sameness requirement. If all a generic need do is desire a change to the label itself, then the principal statutory obligation to use the "same" label would mean nothing. This conclusively refutes FDA's position.

FDA cannot escape this logic. "There is no plausible argument," FDA announces, for construing "required" to mean "needed" or "obligatory" (which are the dictionary definitions of "required") and thereby excluding "optional choices by the generic manufacturer." FDA Br. 44. We agree that generics can make certain choices about their *products*—for example, by "chang[ing] the formulation of the drug" (FDA Br. 44), or "manufactur[ing] [its] drugs in a manner that is not halal" (*id.* at 48). Those changes *to the product* in turn render a labeling change "necessary" to correctly describe the product marketed. Under the different-manufacturer exception, it is the "labeling" "*changes*" that must be "required," not the drug-related differences that precipitate them. 21 U.S.C. § 355(j)(2)(A)(v) (emphasis added).

Ultimately, FDA's argument has no bearing on the circumstances present here. Teva made no change *to the product* that it claims necessitates the omission of Braille. Rather, all that has occurred here is Teva's optional decision (recall MSN included Braille) to exclude Braille. If a manufacturer's desire to change the label is enough to trigger the exception, then the same label requirement would be stripped of all conceivable meaning. The exception would swallow the rule.

FDA's brief addresses a strawman, attempting to rebut that "required" denotes "absolute necessity." FDA Br. 47; *id.* at 51 (suggesting it was not "necessary" to change the label in *Zeneca* because the manufacturer

could have "elected to formulate its product with the same preservative as the brand-name competitor"). But we do not contend that the same-labeling requirement overrides permissible generic *product* choices. The statute does not direct that the two *products* be the "same"—only that they have the same "active ingredient" and be "bioequivalent." 21 U.S.C. § 355(j)(2)(A)(ii), (j)(2)(A)(iv). Our point is that an "optional" choice *about the label* cannot render that label change "required," when the baseline statutory obligation is that the labels *be the same*. *Id.* § 355(j)(2)(A)(v).[1]

FDA's confusion about how *product* changes can be "optional" and still cause *labeling* changes to be "required" is easily explained. *See* FDA Br. 44-51. Take the Federal Rules of Appellate Procedure, which state that "[a] cover is not necessary" for certain papers—meaning it is optional—but "[i]f a cover is used, it must be white"—meaning the white color is necessary and obligatory if the cover is used. Fed. R. App. P. 32(c)(2)(A). Likewise, while it may be "optional" to use a different inactive ingredient than stated on the brand label, if a generic does so, the corresponding label change is "required."

[1] Teva suggests the omission was "downstream" of a "manufacturing difference" because printing Braille requires "distinct equipment." Teva Br. 30. But the means of producing labeling is part and parcel to compliance with the same-labeling requirement.

Defendants concede that Teva's labeling change was optional. Teva made no permissible change in the product that required it to omit Braille. The different-manufacturer exception cannot apply.

### C. Defendants' attempts to rewrite the different-manufacturer exception fail.

Neither FDA nor Teva can rescue their constructions.

#### *1. FDA's construction lacks any basis in the provision.*

"Having no luck with the text" (*Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 332 (D.C. Cir. 2020)), FDA resorts to the FDCA's "overall purpose" to superintend new rules governing the exception's applicability, injecting a series of distinctions and carveouts found nowhere in the provision. FDA Br. 31-44.

FDA posits no short of six different rules to define the different-manufacturer exception.

1. "changes that reflect the optional choices the statutory scheme allows generic manufacturers to make" (FDA Br. 37, 48);
2. changes to protected "trade dress" (FDA Br. 50);
3. changes to a "label's form" but "not its content" (FDA Br. 40; Teva Br. 27);
4. changes to omit "repeat[ed] required information in a different format" (FDA Br. 20);
5. changes to omit "the brand-name manufacturer['s] … voluntary labeling choices" (FDA Br. 22); and
6. changes that do not "materially affect[]" "safety and effectiveness concerns" (FDA Br. 32-33; Teva Br. 29).

These rules are akin to a legislative pronouncement. *Eagle Pharms.*, 952 F.3d at 332-333 (agencies err when "attempted interpretation of legislation becomes legislation itself"). And the driving force behind them is not the exception's language, but FDA's view that these assorted exemptions "do not implicate the Act's 'core function of ensuring that generic drugs are as safe and effective as their pioneer counterparts.'" FDA Br. 38 (quoting JA33); *id.* at 33 (applicability of the exception turns on whether "changes deviate from the Hatch-Waxman Amendments' fundamental principle").

But "neither courts nor federal agencies can rewrite a statute's plain text to correspond to its supposed purposes." *Landstar Exp. Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009). Rather, they must "follow the text even if doing so will supposedly 'undercut a basic objective of the statute.'" *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 135 (2015). FDA cannot draw any coherent understanding of the text from the various rules it sets forth in an effort to salvage Teva's omissions.

The provision's text never mentions form and content, repeated information, voluntary brand features, or safety and effectiveness—FDA's rules 3 to 6.[2] It demands sameness of all "approved" "labeling" while exempting "changes required … because the drug and the listed drug are produced or

---

[2] Nor does it exempt all changes that do not "suggest[] therapeutic difference"—an arbitrary distinction advanced by Teva. Teva Br. 36.

distributed by different manufacturers." 21 U.S.C. § 355(j)(4)(G). To read all of FDA's distinctions into the *exception* (yet not the rule) in the name of legislative purpose makes no sense. It would transform the provision from a general rule with an exception to a provision entirely subject to FDA's discretion, when no discretion-conferring language appears. *Accord Loper Bright*, 603 U.S. at 394-395 & nn. 5-6.

Vanda's position harmonizes the provision: labeling changes are required because a different manufacturer must use its own name and marks and accurately describe the product it markets. That is why FDA's circumstances 1 and 2 fit. FDA has no basis to exempt the remainder. While Braille is far from simply a matter of formatting (*see infra* at 13; FDA Br. 39; Teva Br. 33), a generic label cannot retain a safety warning yet remove the black box around it, strip its bold emphasis, or shrink its font.[3] Nor can it decide that a brand manufacturer's inclusion of certain information was sufficiently "voluntary" to allow a divergence, or that it is sufficiently "safe" to omit a feature; the sameness obligation attaches to all "approved" labeling.

---

[3] Vanda has not "abandoned" its view that the same-labeling requirement applies to form, as Teva claims. Teva Br. 37. Form is an aspect of Braille, and the "bold" font that FDA required for Vanda's dispensing instructions is part of the labeling that Teva wrongfully omitted. Opening Br. 12-13. Teva's assertion stems from the district court's footnote, which mistook Vanda's argument that *de minimis* labeling changes are permissible (JA471) for a departure from its position that the same-labeling requirement applies to formatting. JA32 n.2.

The statutory text cannot be stretched to embrace any change whatsoever so long as FDA blesses it; such a provision would have been written very differently. The text "leaves no room for the FDA to place additional requirements." *Eagle Pharms.*, 952 F.3d at 331.

Finally, FDA's curated list does not even excuse its decision here. Omitting Braille *does* materially affect safety. *See infra* at 27-29. And Braille is not a "design feature[]" or mere "formatting." FDA Br. 39, 50. It conveys the name and strength of the drug, which is "content," as are the dispensing instructions. In all, FDA cannot find any coherent reading of the same-labeling provision that allows Teva to omit Braille.

### 2. *FDA's standard has no basis in precedent.*

Despite FDA's reference to caselaw (FDA Br. 48-51), we showed (Opening Br. 38-40) that it all supports Vanda's reading. *Zeneca* and *Bristol* involved labeling changes that were "required" because of something external from a generic's choice about labeling. *Zeneca*, 213 F.3d at 169 (difference in formulation); *Bristol*, 91 F.3d at 1500 (omission of indication protected by market exclusivity). And the agency mischaracterizes *Hill Dermaceuticals, Inc. v. FDA* as "relying on FDA's regulation implementing the exception." FDA Br. 37 (citing 709 F.3d 44, 48 (D.C. Cir. 2013)). That case instead held that the same-labeling requirement did not apply at all—the brand-labeling feature was no longer "approved," so it did not need to be

copied. *Hill Dermaceuticals*, 709 F.3d at 48. The subsequent dictum about FDA's regulation authorizing changes "made to comply" with FDA guidelines (*id.*) addressed a change that "the agency … require[d]" because the brand-name feature was "misleading" (Br. of Fed. Defs. at 50-52, *Hill Dermaceuticals*, 709 F.3d 44 (No. 12-5182), 2012 WL 6721324).

Finally, FDA cites *Railway Labor Executives' Ass'n v. U.S. Railroad Retirement Board*, 749 F.2d 856, 862-864 (D.C. Cir. 1984), a case vacating an agency decision because it "g[ave] no definitive interpretation" of the word "required." FDA Br. 46. That is exactly what occurred here. Although *Railway Labor* rejected an overly "narrow" interpretation of the statutory phrase, each of the viable meanings conveyed "comp[ulsion]" (749 F.2d at 861), which aligns with Vanda's interpretation, not FDA's.

### ***3. Teva misconstrues statutory terms.***

Teva mimics FDA's arguments but focuses primarily on a new definition of "required" and its analysis of the term, "because." Teva Br. 27-33. Teva's proposed definition does not capture its labeling change. And the word "because," which identifies the cause of the necessity or obligation for a labeling change, has no relevance for changes that are not necessary or obligatory in the first place.

**a.** Teva now claims that "required" means "suitable or appropriate," a sliced-up definition not listed in several dictionaries. Teva Br. 22, 29; *see*

Opening Br. 30-32; *id.* at 31 n.3. That uncommon definition should not be adopted, as it does not represent the term's ordinary meaning—especially in the context of a statute creating a strict legal *obligation* of sameness.

As we noted (at 32), the complete definition is "*call[ed] for* as suitable or appropriate *in a particular case* : *need* for some end or purpose." *Require*, Webster's Third New Int'l Dictionary 1929 (1986) (emphasis added).[4] Teva offers no justification for omitting portions of the definition, and no explanation of why a truncated form should be given weight.[5]

Teva's labeling change was not called for as suitable or appropriate in this particular case. Quite the opposite. Teva's removal of accessibility features for the blind was quintessentially *not* called for, particularly where:

- Blind people have a heightened risk of medication error that Braille alleviates (JA880-904);
- Many prospective users of Teva's generic are already used to Braille labeling (JA571; JA734);
- Vanda's drug is indicated for Non-24 and another condition that does *not* disproportionately affect the blind (JA812; Opening Br. 32);
- Teva's drug is indicated *solely* for a disorder (Non-24) that almost

[4] FDA claims this definition was "applied here," but that is incorrect. Its decisions did not adopt this definition or turn on the "particular case" of Teva but instead applied categorically to "the generics of Hetlioz." JA589 (labeling review); JA951 (citizen-petition denial).

[5] Teva briefly mentions the "particular case" language when first stating what the statutory term "can" mean, but its brief quickly drops that segment in subsequent recitations. Teva Br. 18.

"exclusively affects blind people" (JA571) and is "most prevalent in patients who are totally blind" (JA728; JA613);

- Removing Braille increases risk of medication error (JA880-904);
- Another generic tasimelteon, approved within a month of Teva's approval, included the accessibility features on its label (Opening Br. 18-19; JA208); and
- Teva already provides Braille labeling on drugs it sells in Europe, where Braille is mandatory for all drugs for safety reasons (JA892; JA906-908).

Teva urges the Court to disregard the fact that Teva's "target patient population skews *more* heavily towards blind people than Vanda's" because, Teva claims, Vanda "never raised this argument previously." Teva Br. 33 (quoting Opening Br. 32). That is exactly backwards. Vanda made this point repeatedly below, even though *Teva* failed to timely raise its theory that decreasing accessibility was "appropriate" in Teva's "particular case."

Before Teva's district court reply brief, defendants offered no definition for the term "required," and Teva had agreed with Vanda that the exception authorizes labeling differences that were "necessary." JA360 (cleaned up). Teva then changed its mind, invoking the "suitable or appropriate" definition for the first time on reply. JA505-506. The district court relied on that definition to improperly deem the textual analysis inconclusive. JA23-24. Vanda's opening appellate brief was the first opportunity to refute Teva's contention that it was "suitable or appropriate" for Teva to remove Braille from its labeling.

Meanwhile, at every stage, Vanda highlighted the perversity of Teva's choice to eliminate accessibility features for the blind despite serving them in greater proportion. In its citizen petition, Vanda explained that "there is nothing unique about Teva's drug—driven by its manufacturing process, its physical makeup, or otherwise—that would make the inclusion of Braille inaccurate or inappropriate. To the contrary, Teva's ANDA was approved *only* to treat Non-24, meaning the vast majority of the patients who will use its drug will be blind." JA735; *see also* JA730; JA733-735. Vanda raised this again before the district court. *See* JA149, JA164-165, JA173, JA175 (summary-judgment brief); JA457, JA466 (reply).

In any case, this Court may not affirm "based on a legal rationale different from the one adopted by" the agency. *Calcutt v. Fed. Deposit Ins.*, 598 U.S. 623, 624 (2023). FDA's decisions neither rely on this definition of "required" nor attempt to interpret the term. Opening Br. 2.

**b.** Teva next asserts that Vanda overlooks "the ordinary meaning of 'because.'" Teva Br. 31. When the words "required … because" are considered "together as a phrase," Teva claims, they authorize "changes that logically follow from a voluntary choice fit to the circumstances." Teva Br. 32. But Teva's elimination of accessibility features are not "fit to the circumstances" of this drug and indication, for the reasons already explained. *Supra* at 15-16.

Regardless, this proposed construction lacks merit. Teva extracted this standard from two example sentences, the first about "changes required" to a playbook "because there is a new coach," and the second about "changes required" to a house's layout "because there is a new baby." Teva Br. 32. The first example is unhelpful because a coach has authority over the team's playbook and can exercise that authority to require changes. Generic manufacturers are diametrically disanalogous: the same-labeling requirement restricts their authority. *See PLIVA*, 564 U.S. at 617 (FDA's position that generics must "ask for FDA assistance in convincing the brand-name manufacturer to adopt a stronger label, so that all corresponding generic drug manufacturers could do so as well").

The second example only harms Teva's case. Teva suggests that the baby's arrival can cause both "obligatory" changes to the house's layout and "voluntary ones." Teva Br. 32. That misses the point. The adverbial phrase starting with "because" modifies the word "required," not the noun "changes." *See* The Chicago Manual of Style ¶ 5.156 (17th ed. 2017) ("An adverb … modifies a verb, an adjective, or another adverb."); *id.* ¶ 5.160 (adverbial phrases); *id.* ¶ 5.176 (prepositional phrases as adverbial phrases); Merriam-Webster Dictionary of English Usage 36 (1989). One would not refer to: "uniforms because the team made the playoffs." Grammar demands a verb or adjective: "uniforms *required* because the team

made the playoffs," or "uniforms *ordered* because the team made the playoffs," etc. Whether a parent makes a "voluntary" change because of the new baby has no bearing on whether that change was *required* because of the new baby.[6]

**c.** Finally, the need to replace the proprietary name, Hetlioz®, does not excuse Teva's failure to include the generic name, tasimelteon, in Braille. Teva Br. 37-44. While changing Hetlioz® to tasimelteon *is* required for intellectual property reasons, removing all Braille is not. And Teva cannot analogize its labeling changes to "trade dress" (Teva Br. 37) because trade dress is legally protected and is distinctive to a particular manufacturer or distributor. Opening Br. 44. Braille-free labeling is not protected, not Teva-distinctive, and not *de minimis*.[7] Opening Br. 45 n.4. And it is not "impractical" for FDA to decide when changes to trade dress are necessary or obligatory (Teva Br. 42), as it directs ANDA applicants to "annotate[] and explain[]" all labeling differences. 21 C.F.R. § 314.94(a)(8)(iv).

---

[6] Where the change is not "required," the causation standard is irrelevant. Teva Br. 22, 31-32.

[7] Teva asks the Court to disregard Vanda's statement that "small changes like a variation in font are *de minimis*" because it appears in a footnote. Teva Br. 43 n.12 (citing Opening Br. 45 n.4). But our point was merely illustrative. The propriety of *de minimis* labeling changes is not before the Court, as defendants (rightly) never invoked it to justify their conduct here—for good reason, because Braille lettering is not *de minimis*.

Furthermore, the drug's strength is in Braille, and that is not proprietary. Teva could obviously include the drug strength in Braille—but it declined to do so.

* * *

The statutory question is straightforward: Only those changes "required" "because" the two drugs are produced or distributed by a different manufacturer are permissible. As MSN proves through its inclusion of Braille on its generic label, the new manufacturer does not "require" the exclusion of Braille. The different-manufacturer exception thus does not excuse Teva's omission.

## II. FDA'S APPROVAL VIOLATED THE CONDITIONS-OF-USE REQUIREMENT.

Vanda explained (at 46-51) why Teva's omission of dispensing instructions violates the conditions-of-use-requirement. The instructions are conditions of use: they are "prescribed, recommended, or suggested" on the Hetlioz® label (21 U.S.C. § 355(j)(2)(A)(i)) and relate to safely using the drug—that is, "put[ing] [it] into action or service" (*Use*, Webster's Third New Int'l Dictionary 473 (1986)). The district court's contrary holding—which relies on an atextual limitation construing "conditions of use" to encompass only circumstances "essential to the consumption or taking of the drug" (JA35)—is wrong.

Defendants raise two arguments: Vanda's rule is overly broad, and the statute only prohibits *adding* a condition of use, not omitting one. FDA Br. 53-58; Teva Br. 44-50. Neither argument succeeds.

**a.** Defendants argue that Vanda's interpretation of the "conditions of use" requirement is impermissibly broad, covering "any statement concerning a drug's distribution to a patient." FDA Br. 57; Teva Br. 47 ("Vanda's position appears to be that *all* instructions that appear on the labeling and fall within FDA's authority are conditions of use"). In FDA's telling, even "dispens[ing] in a bottle bearing the trade name Hetlioz" would be a condition of use under Vanda's definition. FDA Br. 57.

Vanda's actual rule is simple: the omitted instructions are conditions of use because they are "prescribed, recommended, or suggested in the … proposed labeling" with respect to proper use of tasimelteon. Opening Br. 49 (quoting 21 U.S.C. § 355(d)). A brand name does *not* instruct on proper "use" of the drug; thus, it is not a condition of use. By contrast, instructions to dispense in the original container and not to cover Braille *do* relate to the safe and effective use of the drug.

Teva appears to recognize that the district court's focus on consumption is textually indefensible (*see, e.g.*, Teva Br. 45 (agreeing with Vanda that "use" means "put into action or service" in addition to "consume or take")). Nonetheless, it grafts onto the conditions-of-use requirement the

limitation that "conditions of use" are "connect[ed] … to a drug's therapeutic effect." Teva Br. 47. It derives that requirement from 21 U.S.C. § 355(j)(2)(A)(iv), which requires a showing that the "new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in clause (i)." But this refers to a wholly separate requirement—that there be the "same therapeutic effect"—than the requirement Vanda invokes. *See id.* § 355(j)(2)(A)(iv). Indeed, this paragraph assumes that the conditions-of-use requirement is *already* satisfied and requires generic applicants to show that, in that scenario, the therapeutic effect is *also* the same.

Teva also argues that the conditions-of-use requirement is limited to "circumstances of utilization by the patient, not directions for how third parties like pharmacists should handle or dispense the drug." Teva Br. 45. But the dispensing of a drug *does* impact the "circumstances of utilization by the patient." *Id.* All agree the dispensing instructions exist to prevent drug misidentification—FDA *told* Vanda to include them for just that purpose. JA592; JA679; *see also* Teva Br. 48 (agreeing the instructions are "intended to avoid inadvertent substitution"). They are intended to help blind patients utilize the correct drug.

More broadly, instructions to third parties, including dispensing instructions, are often conditions of use. *See, e.g.*, *FDA v. All. for Hippocratic*

*Med.*, 602 U.S. 367, 375 (2024) (describing as "conditions of use" requirements that "prescribers undergo specialized training; mandate that the drug be dispensed only in certain settings like hospitals; or direct that doctors monitor patients taking the drug"). Teva appears to recognize that some dispensing instructions directed at pharmacists or doctors *do* qualify as "conditions of use," such as instructions related to "proper storage to prevent degradation." Teva Br. 48. As Vanda noted (Opening Br. 49-50), *many* medications instruct pharmacists to dispense in a light-resistant bottle. Though directed at pharmacists, that is clearly a condition of use.

Teva nonetheless insists that the dispensing instructions in this case differ because they "do not address proper usage of tasimelteon in any way" (Teva Br. 48), but it then identifies exactly how they *do* address proper usage: "they are designed to ensure that a blind patient knows she is taking tasimelteon rather than some other drug" (*id.*). Mistakenly taking another drug is not "proper usage of tasimelteon," whereas correctly identifying the container is proper usage. *Id.*

**b.** Like the district court, defendants also argue that *omission* of a condition of use—rather than *addition*—does not violate the conditions-of-use requirement. *See* JA36; FDA Br. 56-57; Teva Br. 48-50. But neither seriously contends with Vanda's point (at 50) that, where (like here) the condition of use restricts the use of the drug, "[r]emoving [that] restriction on

use necessarily *expands* the possible conditions of use." (emphasis added). Take the requirement to "dispense in a light-safe container." Omitting that restriction expands the conditions of use to dispensing in *any* container. So too here.

Accordingly, as Vanda explained (at 51), *Bristol* does not show otherwise. That case focused on the omission of *indications*. *See* 91 F.3d at 1500; *cf.* FDA Br. 56; Teva Br. 49-50. Unlike removing a condition of use that *restricts* proper usage, removing an indication does not expand the conditions of use. It does the opposite. For instance, Teva's omission of Hetlioz®'s Smith-Magenis Syndrome indication narrows, rather than expands, the label's conditions of use. By contrast, omitting the dispensing instructions *expands* the conditions of use to *any* package, rather than, as with Hetlioz®, the original package with Braille uncovered.

## III. FDA'S DECISIONS WERE ARBITRARY AND CAPRICIOUS.

As Vanda explained (at 51-61), FDA failed—in three separate ways—to exercise reasoned decisionmaking. The agency reversed its prior position on the same-labeling requirement without explanation (*id.* at 52-54); its evaluation of the safety concerns was cursory at best (*id.* at 55-60); and it treated Teva's ANDA differently than MSN's ANDA for the same drug, which *does* include Braille on its label (*id.* at 60-62). Neither FDA nor Teva succeeds in showing otherwise.

### A. FDA's position here is irreconcilable with its position in *PLIVA*.

In *PLIVA*, the government was clear: "FDA has consistently taken the position that an ANDA holder may not unilaterally change its approved labeling." Br. for the United States as *Amicus Curiae* Supporting Resps. at 16, *PLIVA,* 564 U.S. 604 (Nos. 09-993, 09-1039, 09-1501), 2011 WL 741927. This prohibition against "deviat[ing] from the brand-name labeling" applies even where generics seek to "*add* … safety-related information." *Id.* (emphasis added). The different-manufacturer exception, the government added, was "not relevant." *Id.* at 17. After all, voluntary, unilateral changes to drug labels are not "required" because of any difference in manufacturer. 21 U.S.C. § 355(j)(2)(A)(v), (j)(4)(G).

Defendants latch on to minor differences between the facts of *PLIVA* and this case to explain the switch. FDA Br. 59-60; Teva Br. 50-51. But neither can square the government's new, opposite position that a concededly voluntary, unilateral drug label change now *does* implicate the exception.

Noting that *PLIVA* concerned unilateral changes "*after* initial FDA approval," FDA argues it did not opine on the scope of the exception "during FDA's *initial* approval process." FDA Br. 59-60 (quoting *PLIVA*, 564 U.S. at 613). The government took the *opposite* position in *PLIVA*. It repudiated the Fifth Circuit's holding that the same-labeling rules apply differently to "initial[]" approval as opposed to "post-approval modifications." Br. for the

United States, *supra*, at 16. Rather, the same rules govern both stages, as "supplements are by definition part of the application." *Id.* The Supreme Court agreed. *PLIVA* insists that brand and generic labels "must *always* be the same," thus generics "have an *ongoing* federal duty of 'sameness.'" *PLIVA*, 564 U.S. at 613 (emphasis added) (quoting Br. for the United States, *supra*, at 16)).

Teva says (at 50-51) that *PLIVA* was about the "content" of drug labels, whereas this case is about their "form." This rehashes its incorrect arguments on the same-labeling requirement. *See supra* 10-12, 19-20. Regardless, FDA's arguments in *PLIVA* did not turn on that distinction. The government was unequivocal: "[A]n ANDA holder may not unilaterally change its approved labeling." Br. for the United States, *supra*, at 16.

FDA's decision to "treat[] similar situations differently," "without providing a reasoned explanation" for doing so, requires reversal. *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995).

### B. FDA disregarded safety concerns.

The opening brief describes (at 55-60) the considerable record material raising safety concerns about omitting Braille, which FDA brushed aside. In response, Teva and FDA seek refuge in agency deference and overlook—again—safety red flags. FDA Br. 61-65; Teva Br. 51-54.

**1.** Recognizing that FDA said practically *nothing* about the safety of omitting Braille in the ANDA approval, Teva notes that courts may approve agency action "even if its reasoning 'was less than crystal clear.'" Teva Br. 52 (quoting *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006)). But FDA's approval was not "less than crystal clear"—it was *completely silent* on safety, despite clear red flags.

At most, FDA *solicited* feedback on safety and received two responses. One response conveyed thoughtful concerns identifying the key issue: because "the product is indicated for a disorder that exclusively affects blind people," it was unclear that "folks for whom the product is intended could use the product safely" without Braille; "it might be less safe to not have braille on the generics." JA571. The other respondent fired off his "take"—twenty minutes after being asked—that inclusion of Braille was unnecessary because "we don't worry about" including Braille on "other medications." JA289; JA590.

FDA never explained why the latter ad-libbed response was more persuasive than the other respondents', the safety information about Braille in Vanda's NDA (*see* JA637), the judgments of the U.S. Access Board and the European Union (*see* JA887-911), and the obvious safety rationale supporting Braille for a medication disproportionately prescribed to blind people. "[T]he agency's path" cannot "reasonably be discerned." *Casino Airlines*, 439

F.3d at 717. Rather, FDA failed to "respond to objections and address contrary evidence in more than a cursory fashion." *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 543-544 (D.C. Cir. 2010).

**2.** FDA's consideration of Vanda's citizen petition was likewise inadequate. Neither FDA nor Teva can justify FDA's failure to contend with the fact that Teva's drug is approved only to treat a condition disproportionately affecting the blind. It completely overlooked this "important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). And FDA's conclusion that the safety concerns lacked "sufficient support" (FDA Br. 62 (quoting JA925)) disregards Vanda's thorough explanation (at 57-60) of FDA's failure to consider the safety-relevant information before it.

Teva, likewise, fails to meaningfully respond to Vanda's arguments. It notes (at 52) that FDA "canvassed numerous divisions" but omits that two of three divisions declined to opine on safety. *See* JA939-940 (DMEPA skipping question 3); JA952 (OGD doing likewise). The third, having previously opined that Teva's drug might be unsafe, backtracked only because *FDA* has not *yet* received a report about a medication mistake. JA963. But defendants disregard that Vanda *has* received a complaint about Braille disappearing from a patient's prescription. *See* Opening Br. 58 n.6.

### C. FDA treated MSN and Teva differently.

FDA's approval of MSN's ANDA—which includes Braille lettering for "tasimelteon"—is irreconcilable with its approval of Teva's ANDA. *See* Opening Br. 60-61; *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) (agencies may not "appl[y] different standards to similarly situated entities").

Defendants argue that FDA acted consistently because it considered inclusion of Braille "optional" and was thus indifferent to a generic's use or omission of Braille. FDA Br. 66; *see also* Teva Br. 54-55. This disregards Vanda's argument that approving MSN's label "directly contradicts" FDA's reasons for approving Teva's Braille-free label. Opening Br. 61. The different-manufacturer exception cannot explain FDA's approval of Teva's ANDA because, if one generic can include Braille and another with an identical product can omit it, then omitting Braille plainly is not *required* because of a manufacturer difference. FDA's argument that it was unclear what word Teva would put in Braille (*see* JA922) is also unsustainable. *See* JA922. It *was* clear: the answer was on MSN's approved label.

FDA disregards these points. Teva, addressing only the second, argues that Vanda's interpretation was "incoherent" because some difference would be inevitable. Teva Br. 55. Vanda's interpretation is coherent: just as a generic satisfies the same-labeling requirement when using the generic

name instead of the brand name in roman script, doing the same in Braille lettering would have satisfied the statute, *without* stripping a prominent accessibility feature. FDA *knew* this: it approved another ANDA doing just that. Its inconsistency requires reversal.

## CONCLUSION

The Court should reverse and remand for entry of judgment in favor of Vanda.

Dated: November 20, 2025

Respectfully submitted,

/s/ *Paul W. Hughes*
PAUL W. HUGHES
SARAH P. HOGARTH
CONNOR J. SUOZZO
EMMETT WITKOVSKY-ELDRED
*McDermott Will & Schulte LLP*
*500 North Capitol Street NW*
*Washington, DC 20001*
*(202) 756-8000*

*Counsel for Plaintiff-Appellant*
*Vanda Pharmaceuticals Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7) because it contains 6,464 words, excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(e)(1); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: November 20, 2025 /s/ *Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2025, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: November 20, 2025 /s/ *Paul W. Hughes*